EASTERN TRUST & BANKING COMPANY *vs.* ANDREW W. CUNNINGHAM.

Penobscot.     Opinion February 20, 1908.

*Deceit.     Fraud.     False Representations.     Implied Representations.     "Kiting"*
*Checks.     Negligence.*

1.  To support an action for deceit, the plaintiff must show that the defendant intentionally made false representations to him, with the intent that he should act upon them, or in such a manner as would naturally induce him to act upon them, that the representations were material, and that they were known to the defendant to be false, or being of matters susceptible of knowledge, were made as of a fact of his own knowledge, that the plaintiff was thereby induced to give credit or part with property, that he was deceived, and that he was injured.

2.  When the drawer of a check delivers it to the payee, or when he deposits to the credit of his account in one bank his own check drawn upon another bank, a representation is ordinarily implied that there are funds in the drawee bank to meet it, and because of this implied representation, it is a fraud on the part of the drawer to draw and deliver such a check.

3.  If the drawer of check is the treasurer of a corporation and signs it as such, the implied representation that there are funds in the drawee bank to meet it, is his own, for which he is personally responsible. And he is so responsible, though he only signs the check in blank and leaves it with another person to fill out and deliver or deposit.

4. In the case at bar, the corporation of which the defendant was treasurer had an account in the plaintiff bank in Bangor, and another in a bank in Gardiner, in both of which places it was engaged in business. For many months prior to the drawing of the checks which are the basis of this action, the defendant had practiced what is known as "kiting" checks between the plaintiff bank and the bank in Gardiner. He deposited daily in each bank checks, drawn on the other bank to meet which the defendant knew were no sufficient available funds in the drawee bank, and which he knew could only be met by the deposit of other similar checks. The bank at Gardiner discovered the practice, and finally refused payment of a check drawn upon itself, which the defendant had deposited in the plaintiff bank, and which had been forwarded for collection, and caused it to be protested. Before the plaintiff bank had notice of the non-payment and protest, it had accepted two other similar checks, credited them on the account of the defendant's corporation, and forwarded them for collection. Payment of these checks was refused, and they were in their turn protested. The result was that the plaintiff bank lost the amount of the three checks, less a small balance which was to the credit of the corporation when notice of non-payment was first received. The court is of opinion that the evidence does not warrant a finding that the officers of the plaintiff bank knew of the "kiting" practice. On the contrary it is considered that the plaintiff was induced to give credit to the defendant's corporation by his implied representation, which was false, and that it was deceived thereby. Upon these facts, *held* that the defendant is liable in an action for deceit.

5. If the plaintiff's officers were negligent in not discovering the fraud, that fact would not afford a defense. When one party has been guilty of an intentional and deliberate fraud by which to his knowledge another party has been misled or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by showing that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care.

On report.     Judgment for plaintiff.

Action on the case for deceit brought by the plaintiff bank against the defendant in his individual capacity to recover a certain amount of money alleged to have been lost by the plaintiff bank on account of checks deposited in the plaintiff bank, drawn upon the Gardiner National Bank by the defendant in his capacity as treasurer of the Harmon Produce Company against a fund which, it was alleged, did not exist in the said Gardiner National Bank, with the alleged intent on the part of the defendant to deceive and defraud the plaintiff bank. The plaintiff's declaration contains seventeen counts and fills forty printed pages of the size of this page. Plea, the general issue.

The action came on for trial at the April term, 1907, of the Supreme Judicial Court, Penobscot County. At the conclusion of the evidence it was agreed that the case should be reported to the Law Court and that upon so much of the evidence as was legally admissible the Law Court should "render such judgment as the law and the evidence require."

The case fully appears in the opinion.

*Charles A. Bailey and Matthew Laughlin,* for plaintiff.

*George W. Heselton,* for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, SAVAGE, CORNISH, KING, JJ.

SAVAGE, J. Action on the case for deceit. The case is before us on report. The particular transactions complained of are these. The Harmon Produce Company, a corporation doing business and having stores both at Bangor and Gardiner, on October 6, 1905, deposited in the plaintiff bank in Bangor its check dated October 5, signed by the defendant as its treasurer, on the Gardiner National Bank at Gardiner for the sum of $764.58. This deposit with other cash items amounting in all to $860 was received by the plaintiff and credited to the account of the Produce Company. The check in the regular course of business was forwarded for collection through Boston, and reached the Gardiner bank on October 9. The latter bank declined to honor it, but caused it to be protested. Information of the protest reached the plaintiff by telegram from Boston, October 10, and the formal notice was received the following day.

Meanwhile, on October 7, a like check for $1042.21, with other cash items, was deposited by the company in the plaintiff bank, was received and credited, was forwarded for collection through Boston, was received at Gardiner and protested for non-payment October 10, of which the plaintiff had notice October 12. Still another check for $961.95, with other cash items, was deposited and credited October 9, went through the same channels, and was received at Gardiner and protested October 11. Notice of the protest was received by the plaintiff October 13. Thus the plaintiff

had credited to the account of the Produce Company, on account of these checks, the sum of $2768.74, before it had any information of the non-payment of any of the checks. While these checks were severally proceeding along their course to final protest, the plaintiff honored and paid the Produce Company's checks drawn on itself, including three which had been deposited in the Gardiner bank amounting to $2649.10, to the extent that on October 11, when the first protested check came back, there was standing to the credit of the company only $440.79. This amount was appropriated towards that check. The balance, $323.79, of the first check, and the amount of the second and third checks and the protest fees, being $1042.21, $961.95, and $4.56, respectively, amounting in all to $2332.51, the plaintiff seeks to recover in this action.

It appears that the balance to the credit of the Produce Company on the books of the Gardiner National Bank on October 6, the date when the first of these checks was deposited in the plaintiff bank, was $69.28. October 7 it was $24.89. October 9, the day when the first check was received at the Gardiner bank, it was $771.34. This last amount included, however, the company's check for $728, drawn on the plaintiff bank, and that day deposited. The Gardiner bank did not regard the latter check as available funds out of which to pay the company's checks until it was collected, and for that reason declined to honor the $764.58 check in question. As a matter of fact, the $728 check on the plaintiff was never collected, but was protested by the plaintiff bank for non-payment. The company's balance on the books of the Gardiner bank continued in the same condition through October 10 and 11, and on October 12, it would seem from an inspection of the balances, that the $728 check was charged back, or in some other way taken out of the account. It appears then that neither on the days when these three checks in question was severally deposited in the plaintiff bank nor on the days when they were presented for payment to the Gardiner Bank in the regular course of business, did the company have available funds in the latter bank to meet them.

But the defenses set up, which we shall presently consider, make

it necessary to state with considerable detail the previous history of
the dealings of the Harmon Produce Company with the plaintiff
bank.    It appears that the Produce Company for two years or more
previously had been engaged in the practice of what is known in
banking parlance as "kiting" checks, and that the checks in ques-
tion were drawn and deposited in pursuance of that practice.    It
had an account in the plaintiff bank, and one in the Gardiner
National Bank.    It was doing a large businsss on seemingly insuffi-
cient capital.    For the express purpose of getting the use of more
money in its business, it adopted the following method.    It would
deposit its check on the Gardiner bank in the plaintiff bank.    By
the usual methods of collection through Boston the check would
reach Gardiner in two days, or three, if Sunday intervened.    On
the day when it would be expected at the Gardiner bank the
company would deposit in the Gardiner bank a check on the plain-
tiff bank of sufficient size, with the other deposits, to pay the first
check.    Then in two or three days the Gardiner check would be
due to reach the plaintiff bank, and the company would deposit
there another check to meet that, and so on ad infinitum.    By
starting a check each day from each end of the route they were
enabled to keep six checks in the air all of the time, to pay none of
which were there available funds in either bank, unless new kited
checks should be accepted and credited.    The scheme could continue
only as long as both banks were either ignorant or indulgent, or
one ignorant and the other indulgent.    The plaintiff claims that it
was ignorant and that the Gardiner bank was indulgent.    The
defendant claims that both banks had knowledge and were indulgent.
It was inevitable that if either bank chanced at any time to stop
payment on these checks, the other would stand to lose the amount
of three checks.

The defendant was treasurer of the Harmon Produce Company.
He lived at Gardiner.    He did not personally deposit any of the
checks in the plaintiff bank, and perhaps none in Gardiner.    But
he was well aware of the practice of kiting checks which was being
followed, and of the purpose of it.    His custom was to sign checks
in blank and give them to the bookkeepers in the two stores.

They filled out the signed blank checks from day to day as exigencies required and deposited them in the banks, having ascertained by correspondence between themselves daily the amounts which would be necessary to meet checks to arrive. The defendant so signed in blank the three checks in question and sent them to the Bangor store, intending them to be used in the kiting practice. He made the Bangor bookkeeper his agent for the purpose of filling out and depositing the checks. So that his responsibility is the same as if he personally had deposited the checks and procured the credit in the plaintiff bank.

It is incumbent upon the plaintiff to show that the defendant intentionally made false representations to it, with the intent that it should act upon them, or in such a manner as would naturally induce it to act upon them, that the representations were material and that they were known to the defendant to be false, or being of matters susceptible of knowledge, were made as of a fact of his own knowledge, that the plaintiff was thereby induced to give credit to the Produce Company, that it was deceived, and that it was injured. These principles are well settled. In the recent case of *Atlas Shoe Co.* v. *Bechard*, 102 Maine, 197, this language was used:— "Where a person states of his own knowledge material facts which are susceptible of knowledge, and the statement is made with an intent that another party should act upon it, or in such a manner as would naturally induce him to act upon it, the statement so made, if false, is fraudulent both in morals and law." And if the other party is induced thereby to act, and is deceived and injured, he has a cause of action for the deceit. A fraudulent purpose may be inferred from a wilfully false statement in relation to a material fact. *Wheelden* v. *Lowell*, 50 Maine, 499; *Braley* v. *Powers*, 92 Maine, 203. And when the necessary consequences of a transaction is the defrauding of another, fraud may be inferred, and the transaction held to be fraudulent. *Gardiner Sav. Inst.* v. *Emerson*, 91 Maine, 535; *Whitehouse* v. *Bolster*, 95 Maine, 458.

The false representation relied upon here is the representation which ordinarily is implied by the drawer of a check when he delivers it to the payee, that it is drawn against available funds, or that

there are funds in the drawee bank to meet it.   The same implied representation arises when one deposits to the credit of his account in one bank his own check drawn upon another bank.   Because of this implied representation, it is a fraud on the part of the drawer to draw a check upon a bank where there are no funds to meet it. *True* v. *Thomas*, 16 Maine, 37, and cases cited in 44 L. R. A. 397. Such an implied representation was made ·by the defendant when the bookkeeper for him filled out and deposited each of the signed blank checks furnished by him for that express purpose.   The representation went with his signature.   Although he signed as treasurer, the implied representation was his own, for which he was personally responsible.   7 Thomp. Corp. sect. 8569 ; 21 A. & E. Ency. of Law, 2nd Ed. 880 ; *Cole* v. *Cassidy*, 138 Mass. 437. As shown, there were no available funds in the Gardiner bank to meet either of these checks when it was drawn, nor when it was presented.   Nor would the drawing and depositing a check under such circumstances be any less a fraud, even if the depositor had succeeded later in having funds in the Gardiner bank to meet it when presented, though in that case the plaintiff would not have been injured. The defendant in fact knew that there were no funds in the Gardiner bank to meet these checks, when they were drawn.   He knew that the only hope of the checks being honored was his ability to get credit at the Gardiner bank by depositing similar checks on the plaintiff.   He knew that the Gardiner bank was then cognizant of the character of the checks.   He had been notified by it that he must stop drawing them, and he had no reason to suppose that the Gardiner bank would not any day put a stop to the practice by refusing to give credit for the Produce Company's checks on the plaintiff.   So that, even if the defendant's reasonable expectations of being able to meet the checks when presented would constitute a defense, as they would not, yet those expectations in this case were not sufficiently well founded to be reasonable.

Taking the facts thus far presented, we think the plaintiff has clearly shown that the defendant's implied material representations as to funds in the Gardiner bank to meet the checks were false, that they were known to the defendant to be false, and that they were

made with an intent that the plaintiff should act upon them, or in such a manner as would naturally induce it to act upon them. *Atlas Shoe Co.* v. *Bechard*, 102 Maine, 197.   It remains to inquire whether the plaintiff was induced thereby to act to its injury, and whether it was deceived.

The defendant answers these questions in the negative.   He says that the practice of kiting checks between the two banks had been carried on so long, so continuously and so openly that the only reasonable conclusion is that it was known to the responsible officers of the plaintiff bank.   He claims that the inferences of their knowledge are so strong and overwhelming as to overbear the denials in testimony of the officers themselves.   If the fact be as claimed, the defense is made out.   If the officers of the plaintiff knew of this kiting practice at the times the three checks in question were received, and knew or believed that there were no funds in the Gardiner bank to meet them, and expected that these checks would be provided for by other like checks deposited there, we should not say that the plaintiff was induced to act by the defendant's representations, nor should we say that it was deceived.

The kiting practice was begun in June 1903 between the plaintiff bank and the Oakland National Bank of Gardiner, where the Harmon Produce Company then kept its Gardiner account, and so continued until some time in October 1904, when the officers of the Oakland bank, having discovered the practice, declined to keep the account longer.   The account was then transferred to the Gardiner National Bank, and the practice was continued until these checks were protested for non-payment in October 1905.   The defendant however was not treasurer until September 1903.   After he became treasurer he seems for many months to have done no acts as treasurer except to sign blank checks for the bookkeepers to use, and he did not discover the kiting practice until July 1904.   From June 1903 to October 1905 there were 968 kited checks used, 472 deposited in the plaintiff bank payable at one or the other of the Gardiner banks, and 496 deposited in the Gardiner banks payable at the plaintiff bank.   These checks amounted to $660,275.44.   They varied in amount from less than $100 to more than $1400, ranging

in the last month from about $600 to about $1100.    Usually the
checks were drawn for odd amounts, dollars and cents.    They were
never, as far as we can discover, alike on any two days.    They some-
times varied by hundreds of dollars from one day to another.    Nor
were the amounts of the checks deposited day by day the same as
of those which they were deposited to meet.    To illustrate the last
statement we refer to some dates just previous to the drawing of the
checks in question.    On October 2 a check for $750.17 was depos-
ited in Bangor.    It reached Gardiner October 5, on which day a
check on Bangor for $939.06 was deposited in Gardiner.    A check
deposited in Bangor October 3, for $865.14 was met in Gardiner
three days later by a check deposited for $972.    A check deposited
at Bangor October 4, for $1104.85 was met at Gardiner October
7, by a $750 check on Bangor.

Besides the magnitude and incessant continuity of the practice, as
evidence to show actual knowledge, the defendant claims that the
plaintiff's books show that the Produce Company's account was
almost constantly overdrawn, and that this fact must have quickened
the apprehension of the plaintiff's officers and given them notice of
the hollowness of the Produce Company's credit.    But the books do
not show overdrafts except in rare and explainable instances.    The
overdrafts claimed by the defendant are not shown except by exclud-
ing from the account the kited checks which were deposited.

In reply to the defendant's contention, the plaintiff's treasurer,
and its clerks who had to do with the Produce Company's deposits
and accounts have testified and each has denied that he ever dis-
covered, or in any way knew, that the Produce Company was kiting
checks.    The case shows that the plaintiff bank was an institution
with about $3,000,000 deposits and about 3,000 depositors.    The
treasurer had the general control and management, and sometimes
acted as paying teller.    There were four or five clerks.    One of these
was a receiving teller.    In the regular course of business he received
the deposits from the Produce Company.    Accompanying a deposit
was a deposit slip, on which the deposit was itemized, bills, coins,
and checks on various banks, including one on the Gardiner bank.
His duty was to check up the slip and see that the footings were

correct, examine the signatures and count the bills and coin. He put the check on Gardiner in a pigeon hole, from which it was taken by another clerk and caused to be sent for collection through Boston. The deposit slip was taken to the bookkeeper who entered the total, but not the items, on the Produce Company's account to its credit. The slip was then filed away. The check then entered into the accounts with the bank's Boston correspondent, and its identity was lost, unless it was protested.

On the other hand, a check deposited in the Gardiner bank on the plaintiff bank went to Boston, and then came back to Bangor. It was the bookkeeper's duty to open the Boston mail, which he did. He then credited the check to the Boston correspondent, and charged it to the Produce Company, on the bank's books. No other officer or clerk had any duty with that check. The book-keeper was the only employee whose duties required him to have any knowledge of both sides of the account, the credits and charges, and of the credits or deposits he had no duty except to know the total, and his books showed no more.

While the treasurer was in general charge of the bank, and doubtless had a duty to have some knowledge of the general run of depositors and deposits, for the protection of the bank and the promotion of its interests, there is no evidence that his attention was ever called specifically to any suspicious facts respecting the Produce Company's account, though he undoubtedly knew that sometimes the company deposited its own checks on the Gardiner bank. He testifies that he did not ever open the letters containing the checks received through Boston from the Gardiner bank, and that he did not see the checks themselves. He examined the depositors' ledger occasionally to notice the balances. It was the duty of the book-keeper to notify him if there were any overdrafts, but with rare exceptions none appeared on the books. There is no fact shown on which can be properly based an inference of knowledge on his part, except his general duties, and the long continued practice itself. One thing lends an air of great improbability to the defendant's contention. We think we may assume that no one of the officers of the plaintiff bank had ever complained to the Produce Company of

the practice, for if such had been the fact, it would undoubtedly have been offered as evidence of the plaintiff's knowledge.    No such fact appears.    Assuming the defendant's contention to be true, we are therefore face to face with the proposition that the officers of the bank, knowing the practice, permitted it to go on for days or weeks, or perhaps years, without finding any fault about it, and without taking the trouble even to speak about it.    This improbability is so great as materially to strengthen the effect of the sworn denials of the bank's officers and employees.    The improbability is made even stronger when we consider that these officers must have known that if the Gardiner bank discovered the practice and dishonored the checks first, the plaintiff bank must inevitably lose.

Upon a careful study of the whole case, we do not think we are warranted in holding that the plaintiff bank had knowledge of the kiting practice.    On the contrary, we think the evidence requires us to find that the bank was induced to give credit to the Produce Company by the implied representation of the defendant, and that it was deceived thereby.

Doubtless an analysis of the account, and perhaps a not very critical one, would have disclosed the practice.    In the case of a smaller bank, where a single official or clerk receives the deposits and also keeps the accounts or personally oversees them, it would have been easier to discover it, as it was discovered in both the banks at Gardiner.    But ability to discover is not discovery, and in respect to the question of actual knowledge, the situation is not helped unless there was a discovery.

But the defendant contends further that if the plaintiff did not know, it ought to have known, and would have known but for its own negligence.    We think this defense cannot avail.    There are cases which hold that where one carelessly relies upon a pretence of inherent absurdity and incredibility, upon mere idle talk, or upon a device so shadowy as not to be capable of imposing upon any one, he must bear his misfortune, if injured.    He must not shut his eyes to what is palpably before him.    But that doctrine, if sound, is not applicable here.    We think the well settled rule to be applied here is that if one intentionally misrepresents to another facts particu-

larly within his own knowledge, with an intent that the other shall act upon them, and he does so act, he cannot afterwards excuse himself by saying "You were foolish to believe me." It does not lie in his mouth to say that the one trusting him was negligent. In this case the fact whether or not there were funds in the Gardiner bank to meet the checks was peculiarly within the knowledge of the defendant. The rule is stated in Pollock on Torts, sect. 252, as follows:—"It is now settled law that one who chooses to make positive assertions without warrant shall not excuse himself by saying that the other party need not have relied upon them. He must show that his representation was not in fact relied upon. In short, nothing will excuse a culpable misrepresentation short of proof that it was not relied upon, either because the other party knew the truth, or because he relied wholly on his own investigations, or because the alleged fact did not influence his actions at all." In *Linington* v. *Strong*, 107 Ill. 295, we find this language: "The doctrine is well settled that, as a rule, a party guilty of fraudulent conduct shall not be allowed to cry 'negligence' as against his own deliberate fraud. . . . . While the law does require of all parties the exercise of reasonable prudence in the business of life, and does not permit one to rest indifferent in reliance upon the interested representations of an adverse party, still, as before suggested, there is a certain limitation to this rule; and as between the original parties to the transaction, we consider that when it appears that one party has been guilty of an intentional and deliberate fraud by which to his knowledge, the other party has been misled or influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised reasonable diligence and care." See 6 L. R. A. (N. S.) 463.

Finally, the defendant's counsel in argument contends that the plaintiff, by its own conduct, that is, by receiving and crediting these checks for so long a time, gave the defendant cause to believe, and that he did believe, that the kiting was done with the knowledge, approval and consent of the plaintiff. This ground, of course, could be available only by way of estoppel. But since the defend-

ant has not testified that he so believed, and as there is no evidence that he so believed, or that he was misled by the plaintiff's conduct, ignorant or otherwise, it is unnecessary to consider this proposition further.

*Judgment for the plaintiff for $2332.51*
*and interest from the date of the writ.*