2003 ME 11

**Patricia BRAWN et al.**

v.

**ORAL SURGERY ASSOCIATES et al.**

**Robin Dutil et al.**

v.

**John Burns, D.D.S.**

Supreme Judicial Court of Maine.

Argued: Jan. 9, 2002.
Decided: Jan. 30, 2003.
Revised: March 14, 2003.

---

Philip P. Mancini, (orally), Drummond &
Drummond, LLP, Portland, for plaintiffs.

Craig A. Fontaine, (orally), Cramer, Al-
issi & Fontaine, P.C., Hartford, CT, Bryan
M. Dench, James E. Belleau, Esq., Skel-
ton, Taintor & Abbott, P.A., Auburn, for
defendants.

Panel: SAUFLEY, C.J., and
RUDMAN, DANA, and CALKINS, JJ.

DANA, J.

[¶ 1] Twenty-one plaintiffs (plus thirteen spouses)[1] appeal from a judgment entered in the Superior Court (Cumberland County, *Delahanty, J.*) granting the defendants' motion for a summary judgment. The nineteen plaintiffs suing Oral Surgery Associates (OSA) and Lewis N. Estabrooks, O.M.D., Carlton E. Fairbanks, D.M.D., Russell J. Collett, D.D.S., and David J. Moyer, D.D.S., M.D. (hereinafter "the OSA defendants") contend the court erred when it concluded that the plaintiffs' negligence claims were barred by the statute of limitations and that they had not generated a genuine issue of material fact as to whether the OSA defendants had fraudulently concealed[2] some of their claims. All of the plaintiffs, including the two who brought suit against John Burns, D.D.S., challenge the court's dismissal of all of their claims after the court concluded that the defendants breached no duty to the plaintiffs following operations to implant devices to relieve malfunctions of the jawbone's temporomandibular joints. We vacate the judgment in part because there are genuine issues of material fact concerning both malpractice and a pattern of concealment following the dates of the original implants.

## I. BACKGROUND

[¶ 2] This litigation seeks a remedy for the damage to the plaintiffs resulting from the alleged breakdown within their bodies of the teflon proplast implants manufactured, between February 1983 and June 1988, by the now-defunct Vitek Corporation. The implants were supposed to relieve malfunctions of the jawbone's temporomandibular joints. The twenty-one patients received Vitek implants from the OSA defendants and Dr. John Burns[3] between 1983 and 1988 and filed notices of claim between 1993 and 1998.[4] In late

---

1. The Cumberland County plaintiffs who filed suit against OSA are Patricia and Steven Brawn, Robert and Barbara Mathieu (formerly Connelly), Taumi Conohan, Patricia Farnum, Vicki and Douglas Fortier, Elizabeth and Bruce Foster, Sandra Goddard, Stella Harrington, Lisa and Newbern Miner, Paul and Lisa Molnar, Gloria and Richard Nickerson, Michele and Robert Scribner, Bonnie and Timothy Seavey, Mary Shane, Barbara Traynor, Arline and Frederick Trenholm, Kahla Gerard (formerly Varipatis) and Emmanuel Varipatis, Susan Weir, and Joline York. The Kennebec County plaintiffs Sandra and Patrick Ellis and Robin and Ronald Dutil filed suit against John Burns, D.D.S.

 These plaintiffs filed consolidated complaints with plaintiffs from other counties. Neither the defendant sued by the Androscoggin County plaintiffs, (Judith R. Sigurddson, Lynette and Ralph Thompson, and Laura and Michael Vaughn), nor the defendant sued by the Penobscot County plaintiff, (Sonja Jordan), moved for a summary judgment. Thus, these plaintiffs are not subject to the Superior Court's order. While they are listed by plaintiffs' counsel on the brief submitted to this court, they are not part of this appeal. The spelling of all of the preceding names is taken from the plaintiffs' brief.

2. Section 859 of Title 14 of the Maine Revised Statutes provides:

 Limitation extended in cases of fraud
 If a person, liable to any action mentioned, fraudulently conceals the cause thereof from the person entitled thereto, or if a fraud is committed which entitles any person to an action, the action may be commenced at any time within 6 years after the person entitled thereto discovers that he has just cause of action, except as provided in section 3580.

 14 M.R.S.A. § 859 (Supp.2002). Section 3580 sets a limitations period for cases involving fraudulent transfers. 14 M.R.S.A. § 3580 (Supp.2002).

3. Dr. Burns is sued by plaintiffs Dutil and Ellis. The rest of the plaintiffs were patients of OSA.

4. The following dates are taken from the Superior Court's order; the plaintiffs do not dispute the accuracy of these dates. Goddard filed April 30, 1993; Mathieu f.k.a. Connelly, Conohan, Trenholm, Miner, and Seavey filed May 3, 1993. Farnum, Nickerson and Weir filed February 10, 1994; Foster filed May 12, 1994; Scribner filed August 5, 1994; Traynor

December 1990 the United States Food and Drug Administration distributed a safety alert to address "serious problems with proplast coated TMJ implant[s]."

These implants, all of which are made of Proplast® ... have been associated with implant perforation, fragmentation and/or foreign body response which may result in progressive bone degeneration of the mandibular condyle and/or glenoid fossa. If bone degeneration continues unchecked, patients may experience intense pain and severely limited joint function. One study found that all patients with Proplast®-coated ... implants who experienced complications demonstrated progressive bone degeneration in as little as one to two years. In a second study, implant failure and bone degeneration occurred in both symptomatic and asymptomatic patients.

FDA Alert 12/28/90. The FDA recommended that asymptomatic patients undergo "immediate and appropriate radiographic examination." *Id.*

[¶ 3] After the parties waived prelitigation screening,[5] the OSA plaintiffs filed complaints against the OSA defendants asserting claims of product liability, breach of warranty, negligence, and loss of consortium. In July 1999 the Superior Court dismissed all the plaintiffs' claims for product liability, breach of warranty and loss of consortium, leaving only the negligence claims remaining.[6] The complaints allege the defendants were negligent both prior to and after the implant surgery. In January 2000 the defendants moved for a summary judgment against seven[7] of the plaintiffs based on the expiration of the three-year statute of limitations governing medical malpractice claims.[8] In that judg-

---

filed September 16, 1994; Harrington filed May 24, 1995; Fortier and Gerard f.k.a. Varipatis filed June 19, 1995; Dutil filed July 10, 1995; Ellis filed July 31, 1995; Shane and York filed December 10, 1997; Molnar filed March 11, 1998; and Brawn filed August 20, 1998.

5. Section 2853 of Title 24 provides in pertinent part:

The pretrial screening may be bypassed if all parties agree upon a resolution of the claim by lawsuit. All parties to a claim may, by written agreement, submit a claim to the binding determination of the panel, either prior to or after the commencement of a lawsuit. Both parties may agree to bypass the panel and commence a lawsuit for any reason, or may request that certain preliminary legal affirmative defenses or issues be litigated prior to the submission of the case to the panel....
24 M.R.S.A. § 2853(5) (Supp.2002).

6. The suit against Dr. Burns has visited this Court twice before; in *Dutil v. Burns*, 674 A.2d 910, 911 (Me.1996), we affirmed the Superior Court's (Kennebec County, *Alexander, J.*) dismissal of the strict liability, breach of warranty, and negligent sale claims, and in *Dutil v. Burns*, 1997 ME 1, ¶¶ 6–7, 687 A.2d

639, 641–42, we held a second complaint alleging professional negligence was not barred by res judicata, and that the court's ruling on the statute of limitations defense was premature at the notice of claim stage.

7. Defendants filed the motion against Brawn, Fortier, Molnar, Trenholm, Weir, Ellis, and Dutil.

8. Section 2902 in relevant part provides:

Statute of limitations for health care providers and health care practitioners
Actions for professional negligence shall be commenced within 3 years after the cause of action accrues. For the purpose of this section, a cause of action accrues on the date of the act or omission giving rise to the injury.... This· section does not apply where the cause of action is based upon the leaving of a foreign object in the body, in which case the cause of action shall accrue when the plaintiff discovers or reasonably should have discovered the harm. For the purposes of this section, the term "foreign object" does not include a chemical compound, prosthetic aid or object intentionally implanted or permitted to remain in the patient's body as part of the health care or professional services.

ment, the court found that these seven plaintiffs all learned of the dangers to their health more than three years before their notices of claim, and therefore, dismissed their "breach of the duty to warn" claims.[9]

A. The Second Motion for Summary Judgment Regarding Fraudulent Concealment

[¶ 4] In April 2001 the OSA defendants moved for a partial summary judgment on all the plaintiffs' claims that rely upon the six-year statute of limitations available following the discovery of a claim that a defendant has fraudulently concealed.[10] The OSA defendants did not move for a summary judgment on any other claims.

[¶ 5] In their statement of material facts the OSA defendants state that they had, at some point, telephoned two of the plaintiffs (Farnum and Goddard) and urged them to come in for a checkup and had written fourteen other plaintiffs[11] with varying frequency also asking them to come in for an examination.

[¶ 6] According to their statement of material facts, in January and February 1991, following the December 1990 FDA alert, the OSA defendants wrote to eight of the plaintiffs[12] informing them that:

The Federal Drug Administration ... advises us that Proplast Implants "have

been associated with implant perforation, fragmentation and/or foreign body response which may result in progressive bone degeneration of the mandibular condyle and/or glenoid fossa ...."

[¶ 7] Of the eight, five plaintiffs[13] admit they either received the letter from the OSA defendants or otherwise learned of the FDA alert in 1991. Two plaintiffs[14] deny they ever received a notice of the FDA alert, and one plaintiff[15] heard from the FDA directly in 1992. When six[16] of the eight plaintiffs consulted with their OSA oral surgeons in response to a letter or otherwise, two of the OSA surgeons, Dr. Estabrooks and Dr. Collett, assured them that their symptoms were unrelated to the implants.

[¶ 8] The OSA defendants state they sent another letter in October 1991 to the above eight plus an additional two plaintiffs[17] containing copies of the Vitek notice of bankruptcy. The letter provided:

Our records show that you received a TMJ implant from Vitek. This letter is not to imply any damage in the material which was placed but only to inform you of our notification.

[¶ 9] The OSA defendants gave the names of twelve plaintiffs to the Medic Alert Implant Registry in 1991 and 1992. A March 1993 list added two more plain-

---

24 M.R.S.A. § 2902 (2000).

**9.** As we hold later in this opinion, most of the plaintiffs' claims existing at the time of surgery are barred by the statute of limitations. Thus, for the most part, only the post-surgery claims may be actionable. Specifically for the seven plaintiffs who were the subjects of the first motion for summary judgment, it appears that their only remaining claims arise out of the care they received following their operations.

**10.** *See* note 2.

**11.** Conohan, Farnum, Fortier, Goddard, Harrington, Mathieu f.k.a. Connelly, Miner, Mol-

nar, Scribner, Seavey, Shane, Traynor, Trenholm and York.

**12.** Conohan, Farnum, Fortier, Harrington, Molnar, Scribner, Seavey and Trenholm.

**13.** Farnum, Fortier, Molnar, Seavey, and Trenholm.

**14.** Harrington and Scribner.

**15.** Conohan.

**16.** Fortier, Molnar, Scribner, Trenholm, Harrington and Seavey.

**17.** Goddard and Shane.

tiffs. The OSA defendants wrote these fourteen[18] in May 1993 urging them to contact the office. In August 1993 the OSA defendants sent a letter to these fourteen plaintiffs containing an "information packet." An article from the *Journal of Oral and Maxillofacial Surgery* was sent in November 1993 and follow-up letters were sent in 1997 and 1998.

[¶ 10] The OSA defendants offer no evidence that they ever sent the five remaining OSA plaintiffs,[19] any notice. Brawn and Foster state that Dr. Fairbanks refused to acknowledge any connection between their implants and their symptoms. Nickerson said that Dr. Collett also dismissed the existence of any causal relationship between his symptoms and the TMJ implant.

[¶ 11] In May of 2000 the OSA plaintiffs filed an opposition to the OSA defendants' motion for a partial summary judgment including their own statement of material facts as to which they contended that there existed genuine issues to be tried. The plaintiffs properly controverted certain statements of material fact[20] made by the

OSA defendants, and did not sufficiently respond to others. Additionally, the plaintiffs presented further facts in support of their assertion that the OSA defendants had engaged in a pattern of conduct, which they asserted amounted to fraudulent concealment. In their statement of material facts, the plaintiffs reported thirteen "instances of concealment,"[21] the following three being representative:

1. Bonnie Seavey

As a result of receiving the FDA notice in March, 1991, she made an appointment to see Dr. Collett and at the appointment she showed him the letter she received from the FDA and showed him her hearing aid for her left ear. She told him about the pain and all of the symptoms she was having. She described the pain in both jaw joints, the squeaking joints, eye ticks, facial muscle pain, neck pain on both sides down to the shoulder, hearing loss, wearing a hearing aid in her left ear .... She is not certain if she talked to him about her headaches, but the headache pain

---

18. Conohan, Farnum, Fortier, Goddard, Harrington, Mathieu f.k.a. Connelly, Miner, Molnar, Scribner, Seavey, Shane, Traynor, Trenholm, and York.

19. Brawn, Foster, Nickerson, Gerard f.k.a Varipatis, and Weir.

20. In responding to the defendants' statement of material facts the plaintiffs by affidavit stated that:

9. At no time did the OSA Physicians ever disclose to the OSA Plaintiffs that the Teflon Proplast implant might fragment while in their body.

10. At no time post 1990/1991 did the OSA Physicians ever discuss in detail or "bring home" to the OSA Plaintiffs information that fragmentation of the Teflon Proplast implant can cause giant cell reaction or bone degeneration as part of the immune response to particles within their body.

11. To the contrary, whenever OSA Plaintiffs discussed symptoms they were experiencing, the OSA Physicians never disclosed issues relating to giant cell reaction or degeneration of the bone being caused by the implants.

12. OSA Plaintiffs were never encouraged by the OSA Physicians to enroll in the Medic Alert Foundation so that they could gain a clear understanding of these issues and follow any medical developments concerning them.

13. Prior to commencing litigation through the Law Offices of Cloutier & Briggs, P.A., the OSA Plaintiffs never received any writing from the OSA Physicians advising them to be treated or have their medical condition followed elsewhere.

21. The thirteen plaintiffs were: Seavey, Nickerson, Foster, Scribner, Trenholm, Brawn, Fortier, Miner, Connelly, Conoham, Molnar, Harrington, and Traynor.

was more severe and had changed, and the intense pain she experienced on both sides of her jaw in March 1991 was chronic. Dr. Collett's records say that she had few complaints and that the complaints she did have consisted of occasional headaches. That statement is adamantly denied by Bonnie. Dr. Collett goes on to indicate that there was good mandibular function with very little TMJ pain. Dr. Collett is not accurate in recording his clinical evaluation. She states that she had restricted opening of her mandible and could not move her jaw side to side. Dr. Collett indicates that there was no change in her occlusion and she indicates that is not accurate; that her teeth were out of alignment and she was not able to bring them together. Dr. Collett took x-rays of her TMJ's at that time and told her everything looked fine. Dr. Collett told her that the symptoms were caused by her not taking good enough care of herself. There was too much stress in her life and the Teflon disks had nothing to do with the symptoms. She discussed the possibility of removing the disks when she met with Dr. Collett in March 1991 and Dr. Collett told her the FDA is panicking. He said there were a few clients who were misusing their joints. He told her that she was fine and she did not need to have them removed. He did suggest x-rays in six months. Dr. Collett [said] that the implants would not fall out, would not break down, and would be there permanently for the remainder of her lifetime . . . .

2. Barbara Connelly

She is very clear that she never received anything from Dr. Estabrooks' office about the implants, but she did receive a letter from the FDA in approximately January 1993 which precipitated her contacting Dr. Estabrooks immediately. She recalls Dr. Esta-

brooks telling her that the device would not break down, but that if her body rejected it, it might move and the wires breaking would show that the implant had moved. Dr. Estabrooks denied that the Teflon implants caused any problems. She disagrees with Dr. Estabrooks' records that reflect her March 1991 visit with the result of his sending her information about the FDA warnings, and she is very certain that is not true because she saw him in 1993 after receiving the warnings, she wanted to move immediately to have the implants removed before they could cause any significant further damage and the surgery was performed in 1993. . . . The problems she was having at that time which she thought might be related to the Vitek were severe bouts of sinusitis and bronchitis, severe headaches, joint pain throughout her body, fatigue, low grade fever, swollen glands. In 1991 or 1993 when she saw Dr. Estabrooks, he discouraged her from seeking a second opinion. Specifically, in January 1993, she mentioned Dr. Mitchell's name as one of the doctors who understood the problems with Teflon implants, and Dr. Estabrooks assured her that those articles were not true and that she needed to believe him. When she saw him in January 1993, he laughed off the FDA notice and said it was no big deal, and that once a year would be enough to take x-rays. He assured her that those articles were not true. He assured her there were no problems with the Teflon and that the FDA was just being overly cautious. Dr. Estabrooks says that he sent her material in 1991 from the FDA, but she did not receive the material. She doesn't understand why he didn't discuss with her the FDA concerns if he actually sent her that material. She saw him in 1991 and he never mentioned anything like that. He never discussed anything about the FDA until she re-

ceived the FDA report in 1993 and contacted his office for an appointment.

### 3. Barbara Traynor

She is shown Exhibit #2, which is a letter from Dr. Estabrooks' office and recalls receiving that letter and indicates that she called his office to make an appointment upon receiving the letter. When she saw Dr. Estabrooks after making the appointment, he minimized the problem. He wanted to run the show and not have her ask any questions. She became very frustrated with Dr. Estabrooks because he continued to tell her that there was no problem. When she described her symptoms, he suggested that they might be caused from menopause or from the bad divorce she had a couple of years ago. He assured that the implant certainly wasn't causing her any problems. She does not remember when she received the letter from Dr. Estabrooks. She remembers the office appointment very clearly and remembers Dr. Estabrooks being very belittling. He continued to tell her not to worry about the implant. When she saw Dr. Estabrooks after the FDA notice was received, he was not honest with her about [the] discussions that took place [previously].

There are no "instances of concealment" in the statement of material facts for the remaining six OSA plaintiffs.[22] All of the plaintiffs, however, rely on the thirteen instances of concealment as evidence of a pattern of concealment as well as evidence of independent malpractice.

[¶ 12] The OSA defendants replied to the plaintiffs' statement of material facts with a memorandum of law emphasizing their understanding of the law of fraudulent concealment:

[P]laintiffs in their Opposition, do not deny that OSA spent hundreds of hours to identify, locate and attempt to warn plaintiffs. That uncontradicted fact is diametrically inconsistent with fraudulent concealment. On these facts a jury could not reasonably find that OSA fraudulently concealed the fact of injury from plaintiffs.

[¶ 13] Although the OSA defendants assert that they had expended "extraordinary efforts" to warn their patients, they did not file an additional statement of material facts controverting the factual assertions supported by the plaintiffs' statement of material facts.

[¶ 14] Although the OSA defendants had only moved for a partial summary judgment against the OSA plaintiffs on their fraudulent concealment claims, the Superior Court granted a summary judgment against all of the plaintiffs with respect to all their remaining claims of negligence under either the three-year, 24 M.R.S.A. § 2902, or the six-year statute of limitations, 14 M.R.S.A. § 859, and the plaintiffs filed this appeal.

## II. DISCUSSION

[¶ 15] "We review the grant of a motion for summary judgment de novo, viewing the evidence in the light most favorable to the party against whom judgment has been granted to decide whether the parties' statements of material facts and the referenced record material reveal a genuine issue of material fact." *Rogers v. Jackson*, 2002 ME 140, ¶ 5, 804 A.2d 379, 379 (citations omitted). If a genuine issue of material fact exists, summary judgment is improper. *See id.* The plaintiffs bear the burden of making a prima facie showing of each element of their negligence claims in order to defeat summary

---

22. The six plaintiffs being: Farnum, Goddard, Shane, Gerard f.k.a. Varipatis, Weir, and York.

judgment. *See Rutland v. Mullen*, 2002 ME 98, ¶ 8, 798 A.2d 1104, 1109. We examine the evidence presented in the statements of material facts in the light most favorable to the non-prevailing party; the party opposing a summary judgment motion is given the benefit of "any reasonable inferences that a fact-finder could draw from the given facts." *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18, 22; *see also Jenness v. Nickerson*, 637 A.2d 1152, 1154 (Me.1994) (quoting 2 Field, McKusick & Wroth, *Maine Civil Practice* § 56.4 at 39 (2d ed.1970)). We will vacate a summary judgment if there is a genuine issue of material fact, *see Paschal v. City of Bangor*, 2000 ME 50, ¶ 9, 747 A.2d 1194, 1197, or the trial court committed a legal error, *Curtis v. Allstate Ins. Co.*, 2002 ME 9, ¶ 16, 787 A.2d 760, 765.

[¶ 16] Claims for medical malpractice are governed by the Maine Health Security Act, 24 M.R.S.A. §§ 2501–2985 (2000 & Supp.2002). The MHSA dictates the procedural requirements for advancing a professional negligence claim. The statute states "professional negligence" means that:

A. There is a reasonable medical or professional probability that the acts or omissions complained of constitute a deviation from the applicable standard of care by the health care practitioner or health care provider charged with that care; and

B. There is a reasonable medical or professional probability that the acts or omissions complained of proximately caused the injury complained of.

24 M.R.S.A. § 2502(7) (2000).

[¶ 17] Whether a party owes a particular duty of care to another is a question of law within our purview. *Williams v. Inverness Corp.*, 664 A.2d 1244, 1246 (Me.1995). A doctor should use "the ordinary skill of members of [the] profession in like situation ... exercise ordinary or reasonable care and diligence in [the] treatment of the case, and ... use his [or her] best judgment in the application of ... skill to the case." *Coombs v. King*, 107 Me. 376, 378, 78 A. 468, 468 (1910). We have recognized that a doctor has a duty to warn a patient of learned dangers of implanted devices, *see Welch v. McCarthy*, 677 A.2d 1066, 1069 (Me.1996). An action for breach of a physician's duty to obtain the patient's informed consent is limited by statute.[23]

---

**23.** Section 2905 of the MHSA provides in relevant part:

Informed consent to health care treatment

1. Disallowance of recovery on grounds of lack of informed consent. No recovery may be allowed against any physician, podiatrist, dentist or any health care provider upon the grounds that the health care treatment was rendered without the informed consent of the patient or the patient's spouse, parent, guardian, nearest relative or other person authorized to give consent for the patient when:

A. The action of the physician ... in obtaining the consent of the patient ... was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities;

B. A reasonable person, from the information provided by the physician ... under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other physicians ... engaged in the same field or practice in the same or similar communities; or

C. A reasonable person, under all surrounding circumstances, would have undergone such treatment or procedure had that person been advised by the physician ... in accordance with paragraphs A and B or this paragraph

24 M.R.S.A. § 2905(1)(A), (B), (C) (2000).

[¶ 18] From their unrebutted statement of material facts a fact finder could conclude that the OSA oral surgeons and Dr. Burns breached the standard of care required of oral surgeons in that, with respect to the temporomandibular joint implants manufactured by Vitek and implanted in the plaintiffs they:

A. At various times from 1983 to 1988 but *prior* to the implant operations,

1. failed generally to inform the plaintiffs of certain risks and consequences of the planned medical procedure about which they were aware or should have been aware including:

a. their failure to include as part of their informed consent process before surgery any mention of all the reports of foreign body tissue reactions, bone resorption, immune reaction, or long-term immunological responses;

b. their failure to include as part of their informed consent form that Teflon Proplast material could fragment in the body;

c. Dr. Estabrooks' failure to disclose that he first identified the giant cell reaction to a Vitek implant he removed in 1983 or 1984;

d. Dr. Estabrooks' failure to disclose that he contacted the President of Vitek in 1983 or 1984 because the giant cell reaction was of a "limited degree of concern to him";

e. Dr. Estabrooks' failure to disclose that in 1986 he was aware of research trying to interpret the foreign body giant cells found in Vitek recipients; and

f. Dr. Estabrooks' failure to disclose that in 1987 he was informed at a meeting financed by Vitek that patients were experiencing foreign body giant cells and the breakdown of their implants.

B. At various times after the operations but before the filing of notices of claim, which were filed between April 30, 1993, and August 20, 1998,

1. failed generally to provide adequate information from which the plaintiffs could make informed judgments about whether and when to have the Vitek implants removed, including:

a. where appropriate, the failures set forth in paragraphs A.1.a-f;

b. their failure to mention in written communications sent to some, but not all, of their patients following the FDA safety alert dated December 28, 1990;

i. the extensive history of reported medical concerns dating back as far as 1963;

ii. that the implants might fragment while in the body;

iii. that the implants can cause giant cell reaction or bone degeneration as part of the immune response to particles in the body;

c. Dr. Fairbanks' failure to disclose in 1991 that he became aware of studies that demonstrated that the implants could result in bone degeneration around the implant in as little as one to two years;

2. affirmatively misled plaintiffs when they sought advice following receipt of the FDA safety alert, one of OSA's communications, or a newspaper article;

3. never adequately advised the plaintiffs, even after the FDA safety alert dated December 28, 1990, that the implants can cause giant cell reaction or bone degeneration as part of the immune response to the particles in the body;

4. never encouraged the plaintiffs to register with the Medic Alert Foundation; and

5. never advised the plaintiffs to be treated by them or have their medical condition followed elsewhere.

[¶ 19] Plaintiffs' claims can be subdivided as follows:

a) a breach of the duty to adequately warn the patient prior to the operation;

b) fraudulently concealing from the patient during the three-year period following the operation that the oral surgeon had previously breached his duty to adequately warn the patient prior to the operation;

c) fraudulently concealing from the patient after the three-year period following the operation that the surgeon had previously breached his duty to adequately warn the patient prior to the operation;

d) a breach of the duty to adequately advise the patient as to the risks to his/her health of leaving the implants in place during the period after the operation but prior to the three years immediately preceding the filing of the notice of claim; and

e) a breach of the duty to adequately advise the patient as to the risks to his/her health of leaving the implants in place during the period after the operation and within three years of the filing of the notice of claim.

Because the court found that all of the plaintiffs' negligence claims were time-barred, we deal with each of the above claims in order.

**A. Duty to Warn Prior to the Operations**

[¶ 20] Since all of the operations were performed between April 4, 1983, and March 16, 1988, and the earliest notice of claim was filed on April 30, 1993, the court properly granted judgment to the defendants on all of the plaintiffs' negligence claims arising out of the duty to warn prior to the operations. *See* 25 M.R.S.A. § 2902.[24]

**B. Fraudulently concealing within three years of the operation a breach of their duty to warn prior to the operation.**

[¶ 21] Fraudulent concealment is an equitable remedy[25] recognized by courts as a potential means to ameliorate the "harsh application in individual cases" of the medical malpractice statute of limitations. *Hughes v. Glaese,* 659 N.E.2d 516, 519 (Ind.1995) (quoting *Rohrabaugh v. Wagoner,* 274 Ind. 661, 413 N.E.2d 891, 895 (1980)). Fraud is a mixed question of fact and law. *Bixler v. Wright,* 116 Me. 133, 135, 100 A. 467, 468 (1917); *see also Meadors v. Still,* 344 Ark. 307, 40 S.W.3d 294, 312, 315–16 (2001) (recognizing that the issue of fraudulent concealment is normally a question of fact that is not suited for summary judgment; however, because there was no proof of a "positive act of fraud," the court remained unwilling to extend the doctrine to include negligent acts). We have held:

If one intentionally misrepresents to another facts particularly within his own knowledge, with an intent that the other shall act upon them, and he does so act, he cannot afterwards excuse himself by saying, 'You were foolish to believe me.'

**24.** Section 2902 in relevant part is set out at n. 8, *supra.*

**25.** We have held, when examining a legal malpractice claim due to a misrepresentation of a title, that "[s]ection 859 represents legis-

lative recognition of the fact that dating accrual of an undiscoverable cause of action from the time of injury works an injustice on injured plaintiffs." *Anderson v. Neal,* 428 A.2d 1189, 1192 (Me.1981).

It does not lie in his mouth to say that the one trusting him was negligent.

*Bixler*, 116 Me. at 136–37, 100 A. at 469 (quoting *E. Trust & Banking Co. v. Cunningham*, 103 Me. 455, 465–66, 70 A. 17, 22 (1908)).

[¶ 22] To benefit from section 859, a plaintiff must establish "that defendants actively concealed material facts from her and that she relied on their acts and statements to her detriment[,] or . . . that a special relationship existed between the parties that imposed a duty to disclose the cause of action, and the failure of defendants to honor that duty." *Harkness v. Fitzgerald*, 1997 ME 207, ¶ 6, 701 A.2d 370, 372. When a plaintiff contends a genuine issue of material fact concerning the defendant's fraudulent concealment has been generated, the court assesses the facts against the elements of fraud: "(1) the making of a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purposes of inducing another to act upon it; and (5) justifiable and detrimental reliance by the other." *Id.* ¶ 7, 701 A.2d at 372.

[¶ 23] When a "special relationship" exists, that is a fiduciary relationship, "omission by silence may constitute the supplying of false information." *Glynn v. Atlantic Seaboard Corp.*, 1999 ME 53, ¶ 12, 728 A.2d 117, 121. Generally, in such a relationship, where the defendant knows particular facts and does not disclose them causing the plaintiff to rely on those facts, an *inference* of fraud is appropriate. *See id.* ¶ 13, 728 A.2d at 121 (citing *Manning v. Dial*, 271 S.C. 79, 245 S.E.2d 120, 122 (1978) (holding that evidence created an inference of fraud when the officer of the corporation did not disclose all pertinent facts before signing an agreement to sell stock)).

[¶ 24] The plaintiffs who visited the OSA oral surgeons after receiving a notice of possible dangers assert that the surgeons engaged in a pattern of conduct designed to mislead them about the severity of their injuries—a pattern that may both constitute active negligence and amount to fraudulent concealment of earlier negligence.[26] *See, e.g., Brewington v. Raksakulthi*, 584 S.W.2d 112, 113, 115 (Mo.Ct.App.1979) (plaintiff visited physician several times complaining of serious physical problems after childbirth and on each occasion was told her problems were normal and "that she would get better with time;" the court concluded the conduct constituted fraudulent concealment). These plaintiffs raise the possibility that the OSA defendants effectively lulled patients, with their confident reassurances, into believing that teflon implants presented no problems.

[¶ 25] We agree, however, that the plaintiffs presented no evidence that might be found to be fraudulent concealment within the three-year period after the operations of eighteen of the twenty-one patients. After a cause of action expires pursuant to the three-year statute of limitation no amount of subsequent concealment can revitalize an already stale claim. We therefore affirm the Superior Court as to its judgment with respect to those eighteen claims.[27]

[¶ 26] Plaintiffs Harrington and Foster received their implants on January

---

26. Plaintiffs Seavey, Nickerson, Foster, Scribner, Trenholm, Brawn, Fortier, Miner, Connelly, Conahan, Molnar, Harrington, and Traynor provided unrebutted evidence of post-operative negligence and/or fraudulent concealment. The other plaintiffs rely on this evidence as establishing a pattern of malpractice and fraudulent concealment.

27. All plaintiffs, other than Harrington, Foster and Molnar.

14, 1987, and March 16, 1988, respectively. There was evidence presented by those two plaintiffs that the OSA defendants during the three-year period following those operations engaged in conduct that a fact finder might conclude amounted to fraudulent concealment. We therefore vacate the summary judgment to the extent that it was granted to the OSA defendants against Harrington and Foster on their claims of fraudulent concealment.

[¶ 27] Although plaintiff Molnar received his implant on February 27, 1987, and may have had a claim for fraudulent concealment, he learned of his predicament more than six years prior to this notice of claim on May 11, 1998, and therefore judgment was properly entered against him as to that claim.

C. Fraudulently concealing after three years from the date of the operation a breach of a duty to warn prior to the operation.

■ [¶ 28] As we indicated above, any fraudulent concealment must occur *when* the doctor is *liable*, that is, within the applicable medical malpractice statute of limitations. Except for Harrington and Foster, the plaintiffs have not established that the OSA defendants fraudulently concealed their exposure to a claim for a breach of a duty to warn within three years of the operations, and the court properly entered judgment against all the other plaintiffs on those claims.

D. Failing to adequately advise their patients as to the known risks of leaving the implants in place committed after the operations but more than three years before the filing of a notice of claim.

■ [¶ 29] The defendants undertook to follow their patients for a period after the implants, and contrary to their conten-

tions the plaintiffs generated a genuine issue of fact concerning a pattern of postoperative conduct that may amount to malpractice. Some of the plaintiffs allege this type of malpractice occurred more than three years before their notices of claim and thus the three-year statute of limitations set forth in 24 M.R.S.A. § 2902 ran on that negligence. In its ruling on the defendants' first motion for summary judgment the court concluded that seven plaintiffs [28] had learned of the risks associated with their implants more than three years before they filed their notices of claim. Therefore, the court correctly concluded, these plaintiffs no longer had a viable claim against the defendants for failing to advise them earlier because the defendants' duty to warn expired when these plaintiffs became aware of the problem. *See Hatch v, Maine Tank Co., Inc.* 666 A.2d 90, 94 (Me.1995) ("no duty to warn of a product danger that is obvious and apparent to an ordinary reasonable person"); *Lorfano v. Dura Stone Steps, Inc.*, 569 A.2d 195, 197 (Me.1990) (no duty to warn of the obvious danger posed by the use of steps without a handrail).

E. Failing to adequately advise their patients as to the known risks of leaving the implants in place committed with-·in three years of a notice of claim.

[¶ 30] All of the plaintiffs have alleged distinct negligence causes of action, addressing an oral surgeon's duty post-surgery, i.e., a duty concerning follow-up, a duty arising out of various notices received by OSA, and a duty to not commit malpractice when the patient returns all of which is alleged to have occurred within three years of each plaintiff's notice of claim. To the extent that the Superior Court's order was intended to dispose of

28. Brawn, Fortier, Molnar, Trenholm, Weir, Ellis, and Dutil.

all of these claims, we must vacate that part of the judgment.

[¶ 31] We have recognized an oral surgeon's duty to warn of *later discovered* dangers of dental implants. *Welch*, 677 A.2d at 1069 (vacating the summary judgment in favor of the defendant oral surgeon due to an issue of fact about the breach of the duty to warn); *see also Harris v. Raymond*, 715 N.E.2d 388, 394 (Ind.1999) (declaring that, as a matter of law, an oral surgeon has a duty to warn current and former patients of safety issues disclosed by the FDA with respect to dental implants). This "essential" duty arises from the special relationship between the patient, who "relies heavily on the expertise of [the oral surgeon] in making decisions that may greatly impact the patient's health and well-being." *Id.* Once a safety alert is received "it can hardly be argued that any harm to a patient is not foreseeable." *Id.* Moreover, the duty is justified because of the "compelling reasons" to require an oral surgeon who inserts medical devices to "stay abreast of safety issues ... and *promptly* pass along important information." *Id.* (emphasis added). The oral surgeon needs to stay informed to perform responsibly as a medical professional:

> The physician or oral surgeon who inserted the medical device is also in a good position to maintain records of patients who have such devices so that they may be notified if significant new information pertaining to the safety of the medical devices becomes available. Any countervailing interest in guarding against imposing potentially burdensome requirements for finding patients who

may have relocated can be addressed by qualifying the duty so that the physician or oral surgeon need only take reasonable steps to update patient information and to locate patients whose address of record changes.

*Id.* at 395. Whether an oral surgeon was negligent in discharging the duty to warn of a learned risk and whether that breach proximately caused an injury are questions of fact. *Welch*, 677 A.2d at 1069 (citing *Greenstreet v. Brown*, 623 A.2d 1270, 1272 (Me.1993)).

[¶ 32] With respect to the plaintiffs other than the seven whose negligence claims were disposed of in response to defendants' first motion for summary judgment, there is evidence that most of the plaintiffs' post-operative, post-federal advisory negligence claims were filed well within three years of when they claim they learned of the risks associated with the Vitek implants.[29]

[¶ 33] The plaintiffs' initial complaints included a separate claim that the defendants failed to diagnose and treat the plaintiffs even after the defendants gained knowledge of the serious risks associated with proplast implants. Certain OSA plaintiffs acknowledge that they received some kind of notice but when they went to see their oral surgeon, he dismissed or otherwise diverted the patients' concerns (Seavey, Foster, Scribner, Trenholm, Brawn, Fortier, Miner, Mathieu f.k.a. Connelly, Conohan, Molnar, and Traynor). OSA did not controvert these assertions.

[¶ 34] Moreover, the defendants did not establish that recovery is precluded on this claim for the rest of the plaintiffs, i.e.,

---

**29.** Seavey received the FDA notice in March 1991 and filed a notice of claim May 1993. Scribner received "one mailing" from OSA in 1995 and filed a notice of claim in 1994. Miner read a newspaper article in 1992 and filed a notice of claim in 1993. Mathieu f.k.a. Connelly received the FDA notice in 1993 and filed a notice of claim in 1993. Conohan received an OSA notice in 1992 and filed her notice of claim in 1993. Additionally, OSA simply did not move for summary judgment on the duty to warn claims brought by Farnum, Foster, Harrington, Nickerson, Shane, Traynor, Gerard f.k.a. Varipatis, or York.

Dutil, Ellis, Farnum, Goddard, Harrington, Nickerson, Shane, Gerard f.k.a. Varipatis, Weir, and York. Because material facts are in dispute regarding the OSA defendants' conduct in the post-federal advisory notice period, that part of the summary judgment that had the effect of disposing of these claims must be vacated.

### III. CONCLUSION

[¶ 35] The Superior Court did not err in dismissing all of the negligence claims existing at the time of the operations for nineteen of the twenty-one plaintiffs. On the current state of the record, the court erred in entering judgment on the negligence claims existing at the time of the operations for plaintiffs Harrington and Foster based upon a claim of fraudulent concealment.

[¶ 36] Finally, the court erred in entering judgment on the claims of post-operative negligence arising within three years of the various notices of claim.

The entry is:

Judgment on the second motion for summary judgment affirmed in part and vacated in part. Remanded for further proceedings consistent with this opinion.