STATE OF MAINE

KNOX, ss.

FEB 28 2005

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-01-060
JRA - KNO - 2/28/2005

RICHARD NIGHTINGALE,

      Plaintiff

      v.

JAMES LEACH, PAMELA LEACH,
PREMIER PROPERTY MANAGEMENT
AND PREMIER, INC.,

      Defendants

**DECISION AND ORDER**

APR 26 2005

## I.    Introduction.

This matter is before the court for disposition after a nonjury trial. The case was tried previously and appealed to the Law Court which vacated the judgment and remanded the case back to this court. *See Nightingale v. Leach,* 2004 ME 22, 842 A.2d 1277. The parties stipulated that all five counts of the complaint were subject to this retrial, although the Law Court discussed only three of them in its decision. Accordingly, this decision and order endeavors to resolve the issues presented in the complaint and to enter a judgment thereon.

## II.    Facts.

The court has had the benefit of a trial transcript and the parties' post trial memoranda as well as its own notes in evaluating the evidence. From these submissions, and based on the court's own assessment of the credibility of the witnesses, the court makes the following findings of fact:

Richard Nightingale (Nightingale) owned two low-income apartment buildings in Thomaston, subsidized by FmHA, one located at Pine Street, the other at Water Street. He had retained Dirigo Housing (Dirigo) to oversee and manage the apartments,

but met the defendants, James Leach (James) and Pamela Leach (Pamela) (collectively "Leaches"), at an auction and learned that they were in the property management business, doing business as Premier Property Management (Premier). Because they were local, headquartered in Rockland, he decided to retain them in place of Dirigo which worked from Augusta. Accordingly, Nightingale terminated his contract with Dirigo and entered into two separate, but identical, contracts with Premier to manage the two apartment buildings.

Nightingale retained Premier and, presumably, Dirigo, because he did not want to deal with the buildings. He understood that Premier would collect the rents, do all the needed paperwork and keep up the maintenance on the two buildings via its contracts with him.

The two contracts between Nightingale and Premier to manage the two apartment buildings were executed on August 25, 1993, but had an effective date of July 23, 1993. The contracts were "for a period of not more than two years." Pl's. exh. 1, p. 10; pl's. exh. 2, p. 10. Accordingly, the contracts were to expire on July 23, 1995.

Upon their termination, the contracts provided that the parties were to make accountings to each other and the agent, Premier, was to submit the books, records and statements required by FmHA to the owner, Nightingale. In addition, the contracts could be terminated by mutual consent at the end of any month, provided 30 days advance notice was given to FmHA. The contracts also required the agent, Premier, to furnish a fidelity bond in the sum of $50,000.

The contracts called for the agent to be paid $48 per unit per month. Thus, because there were 12 units at Water Street and 30 units at Pine Street, the total monthly compensation for administering the two buildings would be $2,016. This compensation included "overall management" under the agreement and the monthly fees were to be

"treated as a project operation and maintenance expenses." Pl's. exh. 1, pp. 9-10; Pl's. exh. 2, pp. 9-10.

The contracts also provided that there be a management plan attached to them. These plans would provide "a comprehensive and detailed description of the policies and procedures to be followed in the management of the Project[s]. Pl's. exh. 1, p. 2; pl's. exh. 2, p. 2. Under the plan, the agent was obliged to maintain and repair the buildings, including cleaning, painting, carpentry, grounds care, and the like "subject to any limitations imposed by the owner . . . ." Pl's. exh. 1, p. 5; pl's. 2, p. 5. The contracts also authorized the agent with the prior written approval of the owner to purchase materials, equipment, supplies and services, including the hiring of independent contractors, to properly maintain and repair the building. The agent was also to prepare a budget on FmHA forms which would be submitted to the owner and FmHA for approval.

Although the management plans were not produced at trial, the court finds that they were prepared at, or near in time to, the execution of the contract. The Leaches prepared the annual budgets for the administration of Nightingale's apartments for 1994 and 1995. Nightingale had input into the development of these budgets and approved them.

As noted, supra, the contracts expired on July 23, 1995, but Nightingale made no note of that event and allowed Premier to continue to manage the buildings, believing the contracts were still in effect. For her part, Pamela knew the contracts expired in July of 1995 but considered that she was administering them on a month-to-month basis. Nightingale testified that he had the same understanding.

On August 30, 1993, the Leaches incorporated Premier as Premier, Inc. but never advised Nightingale that they had done so. The contracts to manage the plaintiff's properties were never assigned to the new corporation.

On September 11, 1995, the Leaches sold Premier, Inc. to Robert J. Pedreira, Sr. (Robert), and Wilfred J. Pedreira (Wilfred), Robert's father, (collectively "Pedreiras"). Nightingale was unaware of the sale and received no notice from the Leaches that they had sold their business. His contract with the Leaches was not listed as an asset of the corporation in the sales contract.

The contract between the Leaches and the Pedreiras contained the following text:

g.     They [the sellers] will not notify any person for whom Premier is acting as rental agent of the change of ownership (except immediate family members as defined below) without Purchasers' prior written consent.

This provision was agreed to so that the Leaches would not be permitted to contact customers and solicit them as clients for any new enterprises they might establish. The contract also contained a non-compete provision.

At about this time, Nightingale was becoming dissatisfied with the Leaches' management of his properties because he had learned from FmHA that some tenant paperwork had not been properly done and that he had lost the rent subsidy for July of 1995. The amount of the lost subsidy was $1,815. He never approached FmHA, however, with a proposal to replace the Leaches. Instead he went to the office of Premier to discuss these problems with the Leaches. There he met Robert who advised him that he had bought the company and had insufficient funds to work with.

At a subsequent meeting at the office, Nightingale confronted the Leaches with his claim that they had mismanaged his properties by, among other grievances, paying themselves for costs they were not entitled to and that he had received no end of the

year distribution for 1994. He also accused them of "double-dipping" and later asked Robert to review the books to see if the Leaches had been double-billing for their services. At that meeting, however, he did not ask the Leaches for the records concerning his buildings. Indeed, Nightingale never asked the Leaches for these records which they had left with Robert when they sold the business. Some of these were recovered after Nightingale discharged Premier, Inc. years later.

Neither the Leaches nor Robert asked Nightingale to accept the assignment of his contract to Robert, and the Leaches never specifically assigned the contract to the Pedreiras or, as noted, supra, to Premier, Inc. Indeed, Nightingale never discussed a written contract with Robert and never signed one with him or Premier, Inc. However, Robert reasonably believed that he had an oral contract with Nightingale to manage his properties with the same management fees as had been agreed to by the Leaches. This is because he had asked Nightingale if he could continue managing his buildings and had his agreement to pay him the same fees he had paid the Leaches. Robert had wanted to use a generic contract form for Nightingale's apartments but none was ever executed. He also believed he had a 30-day notice of cancellation provision as was contained in the generic contract.

James testified that he believed that the sale of Premier, Inc. to Robert did not entail the assignment of the contract with Nightingale and that that contract terminated on the sale of the business to the Pedreiras. Pamela Leach also believed that the sale of the business did not include the transfer of Nightingale's contract to the Pedreiras and that their contractual obligations to him ended on September 11, 1995, when they sold Premier, Inc. Thus, she believed that at that time Nightingale had the option of choosing a new agent, but expected he would stay with the Pedreiras.

The Leaches neither in July of 1995, when the written contract expired, nor upon their sale of Premier, Inc. made an accounting to Nightingale or turned their books and records over to him as the contracts required; Nightingale also made no accounting to the Leaches or to Premier, Inc. under this provision of the contracts.

After Robert took over Premier, Inc., and the management of Nightingale's buildings, he prepared annual budgets and did a review of the Leaches' records at Nightingale's request. Nightingale did not participate in this process and Robert found him to be 'very hands off." T., p. 168, L. 11. The annual budgets prepared by Robert were, however, sent to FmHA.

Robert managed Nightingale's properties from September 11, 1956, until December of 1998. Subsequent to June 19, 1996, Robert embezzled $65,603 from Nightingale's apartment accounts. Apparently, Nightingale learned of the embezzlement when he discharged Premier, Inc. or Robert in December of 1998 after he had learned that his properties' taxes had not been paid and Thomaston had placed liens on them.

Nightingale never did criminal background checks on the Leaches or the Pedreiras and never checked to see if they had provided the fidelity bonds required under the contracts, but he believed Premier was bonded so that Robert would be covered after he took over the company. In fact, Premier, Inc. was bonded until January 13, 1995. Pamela Leach believed that Robert was a well-respected member of the community when the company was sold to him.

When the Leaches managed the Nightingale apartment buildings, they billed his account for a daily site visit to each building, six days a week at $20 per hour. This would entail testing smoke detectors, minor janitorial work, examining the buildings for the presence of hazards and the like. Once per week each building was cleaned by a

maintenance employee of Premier which was billed to Nightingale's account as janitorial service. They also billed for supplies such as paint, salt and sand, and snow removal, the latter being contracted out. The defendants also billed Nightingale for them to attend a seminar on low-income subsidized housing which was required to maintain certification. They also billed Nightingale's accounts for beeper repair. The defendants, with Nightingale's permission, paid themselves the contractual fee out of his buildings' accounts.

The defendants agree that on some occasions they double-billed the plaintiff's accounts for the services provided to the buildings. So, for example, the Leaches billed Nightingale for site checks or janitorial services twice for the weeks of February 10, February 17, April 14, June 8, and July 31, 1994.[1] Neither the contract nor the management plan, however, spelled out what the defendants could charge the plaintiff for such services. The budget, however, did specifically contain sums for snowplowing and the like.

Consistent with FmHA procedures, the Leaches and Robert prepared monthly reports which were sent to FmHA and Nightingale. These reports detailed monthly income and spending but did not include invoices or work orders. When Nightingale received his copies, he threw them out. The Leaches retained their records and invoices at Premier's office and left them there when they sold the business.

Since 1998 when Robert was terminated, Nightingale has had a manager for his two apartment buildings but does not know if he has a written contract for that service.

---

[1] There are a number of other examples of double-billing which were illustrated by James Leach's testimony and the job work orders produced as exhibits. *See* T., pp. 214-224, 364-369; pl's. exh. 3A. Apparently, though, the plaintiff is seeking damages only for the site visits and janitorial services themselves, which he believes were to be covered by the per unit $48 monthly management fees. He is not seeking redress for double-billing for these services or for unauthorized charges such as the beeper repair. *See* Trial Memorandum, p. 1.

Throughout the relevant time periods in this case, Nightingale knew he could change managers of his apartment buildings with FmHA approval.

## III.   Discussion.

### A.   The Contract Counts.

In count IV of the complaint, Nightingale alleges that his written contracts with the Leaches were personal services contracts which the latter breached by transferring the plaintiff's accounts to Premier, Inc. and then selling the corporation's stock to Robert.  In count V,[2] Nightingale makes a similar claim.  There he says that after the two-year contracts expired, he and the Leaches continued to transact business under the terms of the contract and that they knew, or should have known, that he had confidence in them and would not have continued to do business with them if he had known they had incorporated and transferred the company's stock and his assets to another.  By doing so, Nightingale says, the defendants breached the terms of their implied contract with him.

As damages for these breaches, the plaintiff claims $39,600 for the unauthorized site inspections and weekly janitorial services for the 110 weeks running from the date the contracts were executed until September 11, 1995, the date Premier, Inc. was sold to Robert.  He also says the defendants are liable for the $65,603 embezzled by Robert.  Finally, they ask for an award of $1,815 for the FmHA subsidy lost by the defendants in August, 1995, for the month of July.

As to the first and third claims, the defendants have affirmatively pled statute of limitations as a bar to the plaintiff's recovery.  The limitation on a contract action is six years and accrues at the time of its breach.  14 M.R.S.A. § 752; *Dugan v. Martel*, 588 A.2d

---

[2] Count V is untitled in the complaint but has been characterized by the Law Court as a claim of breach of implied contract. *See Nightingale v. Leach,* 2004 ME 22, ¶¶ 1, 4-5, 842 A.2d 1277, 1278-80.

744, 747, n.2 (1991). Thus, because the complaint was filed on September 7, 2001, only contractual breaches which occurred after September 7, 1995, are actionable.

Recognizing that this would eliminate his claims for the janitorial and inspection charges and the lost FmHA subsidy, the plaintiff offers two arguments why the statute of limitations should not bar these claims.

The first is that when there is a fiduciary relationship between the parties, "the cause of action does not accrue until the plaintiff discovers or reasonably should have discovered the cause of action." *Nevin v. Union Trust Co.*, 1999 ME 47, ¶ 25, 726 A.2d 694, 699. The discovery rule, however, only applies when there exists a fiduciary relationship between the parties in that, "the plaintiff must rely on the defendant's advice as a fiduciary, and the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship." *Id.* (citing *Anderson v. Neal*, 428 A.2d 1189, 1191 (Me. 1981)).

Assuming that a fiduciary relationship existed between Nightingale and the Leaches, the court cannot conclude that Nightingale had to rely on the Leaches' advice, competence or honesty as a fiduciary, as opposed to the type of relationship in which one is dependent on the fiduciary's education or professional skill. Compare *Anderson v. Neal*, 428 A.2d 1189, 1191-93 (Me. 1981). Indeed, the evidence would show that Nightingale had more experience and knowledge than the Leaches in overseeing low-income FmHA subsidized housing. Nightingale had been doing this work for decades and this was the Leaches' first contract – a circumstance which apparently was not concealed from the plaintiff. However, Nightingale preferred to take a passive approach to the management of his buildings and chose to rely on the Leaches' stewardship rather than being compelled to do so by virtue of either their superior skills and education or by virtue of his lack thereof.

More importantly, the court cannot find that Nightingale's claim for unauthorized site inspections or janitorial services would have been "virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship." As the court has found, Nightingale got the monthly reports which detailed monthly income and expenses. He was familiar with these reports, and helped develop the budget which would relate to them, but chose to discard them. While it is true the invoices did not accompany these reports, they were not hidden and could have been reviewed by Nightingale at Premier's nearby office had he wished to take a more active role in monitoring his properties. Indeed, he could have done so after the Leaches turned over the business to the Pedreiras and had left he records behind. At that point, Nightingale asked Pedreira to review them, but it is unknown what the latter found in this review. By the same token, he would not need "an independent investigation" to discover the alleged unauthorized charges. The documents produced at trial were easily understood and, as noted, were likely available to him had he wished to review them. Indeed, he had the motive to do so as in early 1995 he was concerned that he had received no income from his properties for 1994 and was concerned about that circumstance but made no inquiry concerning this lack of income. Had the plaintiff gone to Premier's office to review the "books," where he would be likely to find the invoices, it is possible that he would have been unhappy with what he saw, and then could have sought to terminate the contracts or replace the Leaches when their relationship was set to expire in July, 1995. On the other hand, if the over-billing was simply a mistaken interpretation of the contracts and the management plans, it is possible the errors could have been rectified. Either way, the court cannot find that a review by Nightingale of his properties' records would have necessarily destroyed the fiduciary relationship. Even if that had been the result, the

plaintiff had experience with replacing property managers and could have done so with little difficulty.

All this being so, the court cannot find the "fiduciary relationship" exception to the statute of limitations applies here with the result that the plaintiff's claims for excessive charges for site inspections and janitorial services would have to be considered as time barred.

The plaintiff's second argument is that, by law, when a claim is fraudulently concealed, or if the action is for a fraud, the six-year statute of limitations does not begin to run until the aggrieved party discovers that he has a cause of action. 14 M.R.S.A. § 859. According to the Law Court, under this statute, when a fraudulent concealment occurs, or when there is fraud, the statute begins to run when the existence of the cause of action is discovered, "or should have been discovered by the plaintiff in the exercise of due diligence and ordinary prudence." *Westman v. Armitage,* 215 A.2d 919, 922 (Me. 1966). Said differently, "[t]o benefit from section 859, a plaintiff must establish 'that defendants actively concealed material facts from [him] and that [he] relied on their acts to [his] detriment . . .'" *Brawn v. Oral Surgery Assoc.,* 2003 ME 11, ¶ 22, 819 A.2d 1014, 1026 (quoting *Harkness v. Fitzgerald,* 1997 ME 207, ¶ 6, 701 A.2d 370, 372)..

As discussed, infra, however, there is no evidence that the invoices containing the billings for site visits and janitorial services were actively concealed from Nightingale and, as the court has concluded, with the exercise of "due diligence and ordinary prudence," he could have discovered these billing errors. *Westman,* 215 A.2d at 922. As well, this is not a case of fraud nor would the elements of that cause of action support a claim here of fraudulent concealment. They have not been alleged in the complaint nor are they supported in the evidence. *See Brawn,* 2003 ME 11, ¶ 22, 810 A.2d at 1026..

The plaintiff also argues that the statute of limitations should begin to run on September 11, 1995, when the Leaches sold Premier, Inc. to Robert and his father. This is because the contracts provided for an accounting when they terminated their relationship. Thus, it is said, this is when Nightingale would have learned of the unauthorized charges. The contracts, however, called for a mutual accounting which neither party has undertaken to date. That being so, not only did the plaintiff breach these provisions as well, it would be speculation as to what such accountings might show. Moreover, this failure on the defendants' part is not cited in the complaint as a basis for the plaintiff's claims of breach of contract. As well, consistent with the findings cited infra, the plaintiff could reasonably have discovered his cause of action against the defendants much earlier because the records were available and he had the means and the motivation to review them when he received monthly reports of spending and noticed the lack of distribution for 1994. That being so, the date that the mutual accounting should have occurred is not the date the breach of the express or implied contracts occurred. Instead, they happened, if at all, when each alleged excess charge or double-billing occurred – any one of which could have been readily discovered by the plaintiff. These were "the moment[s] when a wrongful action produce[d] an injury for which a plaintiff is entitled to seek vindication." *Myrick v. James*, 444 A.2d 987, 994 (Me. 1982).

The loss of the FmHA subsidy entails a similar analysis with the same result. Apparently, the Leaches' employee, David Mills, did not file the appropriate paperwork by the end of July, 1995 to obtain the subsidies for that month for Nightingale's business. This loss must have been understood and appreciated before September 8, 1995, at least by the Leaches, because on that date the district loan specialist had appealed on behalf of Nightingale to the state FmHA director to waive "the charges"

resulting from the late submission of the forms which would generate subsidies. *See* def's. exh. 4.

This loss was not hidden from Nightingale; indeed, it was one of the reasons he sought a confrontation with the Leaches that autumn.

Accordingly, the court must conclude that the Leaches breached their contract with Nightingale by not filing paperwork in a timely way with FmHA which they were obliged to do under their contracts. However, this breach occurred on or about August 1, 1995, and August 24, 1995, the date the July forms were sent, but certainly before September 7, 1995, the earliest date a breach could have occurred and been within the statute of limitations applicable in this case.

Because neither the fiduciary relationship nor the fraud exceptions to the running of the statute of limitations apply in this case for the reasons discussed, infra, the court must find that the plaintiff's cause of action accrued the moment the Leaches' wrongful action in not filing paperwork with FmHA occurred because it was then that Nightingale was injured and could have sought vindication for this breach of his contracts with the defendants. *Kasu Corp. v. Blake, Hall & Sprague, Inc.*, 582 A.2d 978, 980 (Me. 1990). Because this occurred more than six years before the complaint was filed, the defendants are entitled to judgment in their favor on count IV of the complaint as to this claim.

The plaintiff also says that the defendants may not rely on the principle of novation to avoid liability for Pedreira's embezzlement. That is, the plaintiff argues, because there was no novation of the management agreement between him and Pedreira, the Leaches were still liable for its breach on a theory of implied contract.

Nightingale's first argument that novation cannot be applied in this case is that it is an affirmative defense which must be pled and is waived if it is not. Although there

is apparently no case law in our state on point, the modern authorities cited by the plaintiff are persuasive that novation is an affirmative defense. *See* 58 AM. JUR. 2D *Novation* § 33. Logic supports this conclusion because it would ordinarily be a defendant who would attempt to show that he was not bound by a contract to a plaintiff because the latter had entered into a new, substitute contract which relieved the former. Were it otherwise, a plaintiff would be called upon in every contract case to allege and then prove the absence of novation – the task of proving a negative ordinarily not being assigned to the plaintiff. Thus, for example, M.R. Civ. P. 8(c) requires the defendant to allege and prove defenses which, like novation, would serve to avoid liability such as accord and satisfaction, discharge in bankruptcy, payment, waiver, etc.

Even though our rules require that an affirmative defense be pled by the defendant, the failure to do so is not fatal if the issue was tried by express or implied consent of the parties. M.R. Civ. P. 15(b); *Clarke v. DiPietro*, 525 A.2d 623, 626 (Me. 1987). Indeed, the cited rule would even allow amendment after judgment. Thus, even this late in the litigation, the defendant may be permitted to raise this defense provided, however, that the plaintiff is not prejudiced by the post-trial amendment. *Clarke*, 525 A.2d at 625.

In the court's view, the issue of novation was tried with the implied consent of the plaintiff. The Law Court reversed this case, in part, because this court erred in entering judgment for the defendants as a matter of law when, taking the evidence in the light most favorable to the plaintiff, it failed to consider on the evidence before it the absence of a novation which would have yielded a different result. *See Nightingale v. Leach*, 2004 ME 22, ¶¶ 4-6, 842 A.2d 1277, 1279-80. Thus, the parties knew when it began this retrial that the presence or absence of a novation was central to the two most

important counts in the complaint – breach of express contract and breach of implied contract.

The record would also show that the parties focused some of their evidentiary presentations on whether or not Nightingale approved, gave a novation to, a new contract with the Pedreiras to replace the one with the Leaches.

Finally, the plaintiff has cited no prejudice resulting from the consideration of this defense. He has pointed to no discovery he would have conducted and no evidence he would have presented if the issue of novation had been expressly pled by the defendants.

From all this, the court concludes that the issue of novation was tried by the parties by implied consent and must therefore be addressed by the court.

The Law Court's opinion also advises that if the evidence were to be taken in the light most favorable to Nightingale, his management contracts with the Leaches were personal services contracts and therefore nondelegable absent a novation. *Id.* ¶ 5, n.1, 842 A.2d 1277, 1278-80. Of course, the author of this decision does not know what the evidence might have been at the first trial on the nature of the contract between the parties, but the defendants have admitted that their contract with Nightingale was a personal services contract. *See* Complaint, ¶ 1; Answer, ¶ 1. Moreover, nothing in the evidence or in the defendants' post-trial submission contradicts the plaintiff's characterization of this contract.

Thus, consistent with the Law Court's guidance, this court must determine if there was a novation. If so, the Leaches are relieved of any burdens under the contract; if not, they are liable for its breach.

A novation can be defined as a form of substituted contract. "{A} 'substituted contract' is defined as a contract that is itself accepted by the obligee in satisfaction of

the obligor's existing duty." 58 AM. JUR. 2D *Novation* § 1 (QUOTING RESTATEMENT (SECOND) OF CONTRACTS, § 279). A contract of novation requires: 1) a previous valid obligation, 2) the agreement of all parties to a new contract, 3) the validity of the new contract, and 4) extinguishment of the old contract or obligation by the new contract. *Id.* § 3.

In the court's view, the defendants have established that there was a novation of their original contract with Nightingale by a substituted contract between him and Premier, Inc.

First, there can be no question that Nightingale had a valid contract with the Leaches to manage his buildings. Even though that contract expired in July of 1995, the parties operated with the understanding that it continued on a month-to-month basis. This was not changed by the incorporation of Premier because the contract was never assigned to it.

Second, the court must find that all the parties agreed to a new contract. There can be no question that the Leaches believed that their contract with Nightingale ended when they sold their business to the Pedreiras. Premier, Inc. never had a contract with Nightingale but it was that entity which administered Leaches' obligations to him after it was incorporated. When the Leaches sold that business, the terms of that contract can only be understood to mean that they were going to be out of the apartment management business and the buyers would be attempting to hold on to its customers, including Nightingale, the largest client.

The Pedreiras, too, believed and intended that they become the new obligors to manage the Nightingale apartments. They had insisted on the provision in the contract to buy Premier, Inc. that they be the first to notify customers of the sale and were particularly motivated to do so with Nightingale, the largest client of Premier. As it

turned out, it was Robert who notified Nightingale of the sale when the latter decided to take action on his dissatisfaction with the Leaches. Thereafter, Premier, Inc., through Robert, administered the Nightingale accounts and was paid for this service for over three years. During this time, of course, the Leaches had no role in this activity because they believed they were done with this enterprise and the Pedreiras had taken over.

Whether Nightingale agreed to this new contract is more troublesome, but reference to the authorities here cited assists in resolving this aspect of the parties' debate concerning the existence of a novation.

Thus, as the Restatement advises, if an obligor under a contract, Nightingale, has knowledge of the repudiation of the contract by an assignor, the Leaches, and accepts the performance from the assignee, Premier, Inc., without reserving his rights against the assignor, "a novation arises by which the duty of the assigner is discharged and a similar duty of the assignee is substituted." RESTATEMENT (SECOND) OF CONTRACTS § 329(2); Illus. 2; *see also* 58 AM. JUR. 2D, *Novation* § 20. Moreover, the original obligors, the Leaches, are discharged by the substitution of a new obligor if the obligee, Nightingale "makes a binding manifestation of assent, forming a novation." *Id.* § 318 cmt. d. Or, as expressed by AmJur., "A novation may occur by a three party agreement whereby the delegatee [Premier, Inc.] assumes the duty of the original obligor [the Leaches] and this assumption is accepted by the obligee [Nightingale] in substitution for the original obligor's liability." 58 AM. JUR. 2D, *Novation* § 18.

As to this case, then, essential to a finding of a novation is the assent to or acceptance of the Pedreiras' management of the buildings by their owner, Nightingale. Such an assent or acceptance may, as it does here, constitute an agreement because an agreement to a novation may be implied; that is "a party's knowledge of and consent to a novation need not be express but may be implied from his or her conduct from the

surrounding circumstances." WILLISTON ON CONTRACTS, § 76:14 (4[th] ed., Lord). Finally, "Novation may be established either by direct evidence or circumstantially by proof of facts from which the intention to effect such an agreement may be reasonably implied. In determining whether novation was intended, the court may consider the subsequent conduct of the parties." 58 AM. JUR. 2D, *Novation* § 40.

So, while it is true that the evidence does not show that Nightingale ever expressly entered into a new management contract with the Pedreiras, the totality of the evidence demonstrates that he agreed to their undertaking of the responsibility for his buildings and discharged the Leaches from this obligation.

Nightingale learned that the Leaches had lost FmHA rent subsidies and also came to believe that they were dishonest; that is, that they were double-billing for their services. As a result, he went to confront them and demanded $2,000. At about this time, he had learned that the Leaches had sold their business and was advised by Robert, the new owner, that he did not have sufficient funds to operate. Had he not learned from Robert that he was now in charge, it is very likely that Nightingale would have fired the Leaches and terminated his contract. As noted, he must have believed that they had lost him money, stolen from him, and had spent down the accounts so that the business had no operating funds. As he agreed in his testimony, he would not do business or continue to do business with someone he believed had cheated him. T., p. 43, L. 21-25. Under these circumstances, it is impossible to believe that Nightingale would continue to do business with the Leaches but, rather, that he accepted the Pedreiras' management in their place because the practices of the former were not acceptable. In essence, then, the Leaches were functionally discharged and their business relationship with Nightingale was over. Indeed, the first assignment

Nightingale gave Robert when the latter took over was to perform an accounting to determine how much the Leaches had double-billed.

At approximately the same time, Robert specifically asked Nightingale if Premier, Inc. could manage his buildings. While Nightingale never expressly agreed to this, not only did he ask Robert to do the accounting but, more importantly, he accepted his management of his properties for over three years during which time, of course, Premier, Inc. was being paid for their services. During all this time, Nightingale knew he could replace the Leaches or Premier, Inc. because he had switched managers before and had discussed a change with FmHA. Instead, he was content to have the Pedreiras run his business while he must have understood that his month-to-month relationship with the Leaches was over because, first, they sold their business and, second, they would likely have been discharged had they wished to remain.

From all this, then, the court concludes that Nightingale agreed to a new contract and that this contract was a valid one; that is Robert offered a service, Nightingale accepted it, and their was mutual consideration for this agreement.

By virtue of these same factual findings, the court also finds that the original contract with the Leaches was extinguished and replaced by the new contract.

Accordingly, as noted, infra, the court finds the defendants have proven that there was a novation and that they were discharged from their obligations under the original contracts. That being so, they may not be held liable via the breach of the new contract by virtue of Robert's embezzlement.

Because of these conclusions, the court must enter judgment for the defendants on count V.

### B. Negligence.

In count I of the complaint, the plaintiff offers a broadly worded claim of negligence which advises its reader that the defendants failed to use reasonable care and had been negligent in failing to protect the assets of the plaintiff as well as the "future assets of Plaintiff in the form of rent to be paid." Complaint, Count I, ¶ 15. No further explanation of this claim is articulated in the complaint and none is offered in the plaintiff's post-trial memorandum.

From a reading of the Law Court opinion, however, it appears that the alleged negligence may be the Leaches' action in selling their corporation to Robert and presumably leaving Nightingale to deal with this party who turned out to be a thief. The discussion on novation, infra, aside, it must be remembered that the Leaches never specifically assigned the Nightingale contract to Premier, Inc. or to Robert. Instead, Nightingale accepted Robert as his new overseer although that may not have occurred but for the Leaches agreeing to sell their company to the Pedreiras which gave Robert the opportunity to take over management of the plaintiff's properties.

It is unknown if it is the sale of the company to Robert without doing a background check on him or if it is the tolerance of the latter's assumption of the management of the plaintiff's property after the Leaches sold the business which amounts to a breach of the duty of care or negligence in this case. Whatever the factual theory which may underpin the plaintiff's negligence claim, the court finds that the defendants have established by a preponderance that the plaintiff's own negligence contributed more to his losses than did the defendants'. Accordingly, he may not recover under his negligence claim. 14 M.R.S.A. § 156.

The plaintiff took a "hands-off" approach to managing his buildings. He hired Dirigo and the Leaches because he did not want to deal with the apartment buildings.

He threw out the Leaches' monthly reports, took no steps to be sure they or Robert were bonded, did no background checks on these people, and took no steps to monitor the administration of his buildings even after he became concerned that he was not getting the expected income from them. Further, he did not remain aware as to when his contract with the Leaches expired and does not know today whether he has a contract with his current manager. When the Leaches left, he did not demand his records or an accounting, as was his right, and was content to allow Robert to figure out if the Leaches had over-billed. Finally, as with the Leaches, Nightingale took a "hands-off" approach to the management of this business when Robert took over. In the court's view, this neglect exceeds the unspecified negligence of the Leaches and prevents recovery under this count.

### C.   Conversion.

In count II of the complaint, the plaintiff pleads conversion and alleges that the transfer of his accounts and contract rights to Premier, Inc. and Robert without his permission constitutes conversion.

As with the negligence count, this claim received no attention at trial, was not mentioned in the plaintiff's post-trial brief, and was not discussed by the Law Court in its order of remand. In all likelihood this is because this count enjoys no supporting facts in the record.

The Law Court has identified the necessary elements of a cause of action in conversion as follows:

> (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the older.

*Wthers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798, 800.

The plaintiff has shown that he had a property interest in the books and records for his apartment buildings that were kept at the offices of Premier, Inc. He has also proven that he had the right to their possession when the Leaches terminated their contract and left these records behind at the office. The plaintiff cannot prove, however, that he demanded that the Leaches return his records to him or that they denied such a request. Indeed, Nightingale knew the records were at Premier's office and was content to leave them there while Robert did his requested audit.

So, because the plaintiff cannot prove this essential element of conversion, judgment must be entered for the defendants on this count.

### D. Breach of Trust.

In count III of the complaint, the plaintiff alleges that by taking control of his assets and other interests, the Leaches became trustees for his benefit. He further says that by delivery of these assets and interests to Robert without his permission, knowledge and consent, and by concealing that fact from the plaintiff, the defendants breached that trust for which the plaintiff ought to be awarded damages.

Just as with count II, the plaintiff did not brief this claim, nor did the Law Court discuss it in their decision which reversed the earlier order of this court.

Assuming that a cause of action exists based on the allegations cited in this count, the proof presented fails to support it. As noted, infra, it may be that there was a fiduciary relationship between the Leaches and Nightingale in that he entrusted the management of his buildings to them. This relationship did entail the Leaches having responsibility for these buildings and the records and accounts associated with them.

It is also true that the Leaches sold their business to the Pedreiras without notice to Nightingale and turned over his account and assets to Premier, Inc. and to the Pedreiras without Nightingale's consent.

After those transactions had been accomplished, however, Nightingale accepted the new management of the Pedreiras d/b/a Premier, Inc. and authorized them to serve as his agents for over three years. During this time, and before as well, there was no impediment to Nightingale recovering his records or changing managers if he wished to. That being the case, there was no actionable harm which befell Nightingale by virtue of the transaction of which he complains. As noted, he accepted the new management relationship; that he was disappointed and later victimized by the new manager is not the fault of the Leaches. Indeed, the plaintiff cites to no facts or law, other than the breach of implied contract count, which would impose liability on the Leaches because Robert later misused Nightingale's property and abused his trust.

This count, too, will not serve as a basis for a judgment favorable to the plaintiff.

## IV.    Conclusion.

For the reasons stated herein, the entry will be:

Judgment for the defendants on the plaintiff's complaint.

Dated: February 25, 2005

John R. Atwood
Justice, Superior Court

RICHARD NIGHTINGALE VS JAMES LEACH, PAMELA LEACH, PREMIER PROPERTY MANG.
UTN:AOCSsr  -2004-0035989                    CASE #:ROCSC-CV-2001-00060
-----------------------------------------------------------------------
RICHARD NIGHTINGALE                                      PL
ATTY BAIUNGO, JOSEPH W.   Tel# (207) 338-6841
ATTY ADDR:111A CHURCH ST BELFAST ME 04915

JAMES LEACH                                             DEF
ATTY WATKINSON, RANDAL  Tel# (207) 594-8400
ATTY ADDR:10 MASONIC ST PO BOX 248 ROCKLAND ME 04841-0248

PAMELA LEACH                                            DEF
ATTY WATKINSON, RANDAL  Tel# (207) 594-8400
ATTY ADDR:10 MASONIC ST PO BOX 248 ROCKLAND ME 04841-0248


M=More, Space = Exit:M

Select the EXIT KEY for page selection line.