STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO.: CV-07-359

RESIDENTIAL MORTGAGE
SERVICES, INC.,

         Plaintiff,

         v.                                       ORDER

GREGORY DAUPHINEE,

         Defendant.


This action is brought by plaintiff Residential Mortgage Services Inc. (RMS) against defendant Gregory Dauphinee, a former employee who worked for RMS as a mortgage broker/loan originator, to enforce a non-competition and non-disclosure agreement that Dauphinee allegedly breached. Before this court is a motion by Dauphinee for summary judgment.


1.    Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. *E.g., Johnson v. McNeil*, 2002 ME 99, ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the nonmoving party. *Id.* Thus, for purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law,

summary judgment should be granted. *Rodrigue v. Rodrigue*, 1997 ME 99, ¶ 8, 694 A.2d 924, 926.

In this case, Dauphinee's motion for summary judgment is complicated by the fact that certain of the documents relied upon by one or another of the parties have been designated for confidential treatment under a protective order requested by RMS. Originally, major portions of the summary judgment motion and the opposition thereto were filed under seal (including, in their entirety, both plaintiff's memorandum in opposition to summary judgment and plaintiff's opposing statement of material facts). On September 17, 2008, the court ordered the parties to file their summary judgment papers in a form that could be placed in the public court file, redacting only those limited portions as to which confidentiality would be specifically justified.

The parties then re-filed their summary judgment papers with more limited redactions. The court is still not convinced that all of the more limited portions and exhibits filed under seal deserve the confidential treatment that has been claimed. Moreover, even to the extent that the redactions are justified, the existence of a summary judgment record that is partially sealed has complicated the process of determining whether there are material factual disputes for trial.

2.    Continued Existence of Noncompetition and Nondisclosure Agreement

The first set of issues raised by defendant's summary judgment motion relate to the breach of contract claims raised by RMS and whether the 2002 Noncompetition and Nondisclosure Agreement relied upon by RMS was still in effect as of June 20, 2007, when Dauphinee left RMS. On these issues the court finds that there are factual disputes requiring a trial.

2

At the outset, although RMS argues to the contrary, it is undisputed that Dauphinee originally resigned as an employee of RMS on May 15, 2006. Under the terms of the 2002 Noncompetition and Nondisclosure Agreement, that event would have triggered the beginning of a six-month covenant not to compete and that covenant would have expired well before the events now complained of by RMS. However, it is also undisputed that four days after Dauphinee's May 15, 2006 resignation, Dauphinee and RMS negotiated the terms of an agreement under which Dauphinee would return to work with RMS and that Dauphinee did return and work at RMS until June 20, 2007. There is a disputed issue for trial as to whether Dauphinee's return was pursuant to an agreement to extend his noncompetition agreement. *See* May 19, 2006 terms and conditions document, ¶ 9.

Dauphinee points out that the May 19, 2006 document relied upon by RMS for the proposition that the noncompetition agreement was renewed on that date was accompanied by a memo which stated that "your contract will be forthcoming." No subsequent contract was signed. However, there is a factual dispute for trial as to whether the May 19, 2006 document was only an "agreement to agree" or whether it constituted a binding agreement in its own right. In addition, although Dauphinee points out that at least two of the provisions in the May 19, 2006 document were not fulfilled, *see* May 19, 2006 agreement, ¶¶ 1-2,[1] there is a disputed issue of fact as to whether Dauphinee ever sought to pursue those conditions.

Finally, while the Noncompetition Agreement may or may not be too broadly worded, the court cannot on this record conclude that RMS is not entitled to enforce the agreement, at least as to Dauphinee's alleged contacts with customers he worked with

---

[1] Dauphinee contends that a third condition was not met, see May 19, 2006 document, ¶ 3 (office in Yarmouth), but the May 19, 2006 document does not specify whose name was to be on the Yarmouth lease and absent some further evidence, it is not clear that RMS failed to meet this condition.

at RMS and Dauphinee's alleged interference with RMS's goodwill. *See Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me. 1988) (damages sought only for specific accounts taken in violation of noncompetition agreement). There is also potentially an argument that business in the mortgage industry is not dependent on goodwill and that real estate brokers and homeowners simply shop around for the best deal. However, that issue can only be resolved at trial.

3.     Liquidated Damages Issue

Dauphinee's motion also challenges RMS's claim for liquidated damages under the 2002 Noncompetition and Nondisclosure Agreement.

In order to constitute an enforceable liquidated damages provision, as opposed to an unenforceable penalty, the agreed-upon damages provision must meet a two-part test: (1) the damages caused by a breach must be very difficult to estimate accurately, and (2) the amount fixed by the agreement must be a reasonable forecast of the amount necessary to justly compensate one party for the loss occasioned by the other's breach. *See Raisin Memorial Trust v. Casey*, 2008 ME 63, ¶ 16, 945 A.2d 1211, 1215. The enforceability of a provision for liquidated damages is an issue of law, but determination of whether the two-part test is met is a question of fact. *Id.* ¶ 17, 945 A.2d at 1215.

The Noncompetition Agreement in this case (assuming that it remained in effect after May 2006) provided that Dauphinee would not offer services similar to those provided by RMS for a period of six months after employee's termination. Agreement § 2.1. The Liquidated Damages provision in that agreement provides that:

> [i]n the event of a breach by Employee of the noncompete provisions of this Agreement, Company shall be entitled to liquidated damages equal to the greater of the amount(s) paid to or earned by Employee during the

4

twelve (12) month period after Employee's termination of employment from the prohibited activities or the amount of revenue lost by the Company from the prohibited activities during said twelve (12) month period.

*Id.* § 3.2.

On the face of the agreement, the provision calling for payment of the amount earned by Dauphinee for the twelve month period after he left RMS—when the noncompetition agreement itself only precludes competition for six months—appears to be a penalty rather than a "reasonable forecast" of the amount necessary to compensate RMS for the breach. As RMS acknowledges, the reasonableness of the amount of liquidated damages is to be examined as of the date the contract was formed. *See* Plaintiff's memorandum in opposition to motion for summary judgment dated October 7, 2008, at 13, citing *CIT Group/Equipment Financing, Inc. v. ACEC Maine, Inc.*, 782 F. Supp. 159, 162 (D. Me. 1992). Nevertheless, RMS has offered no evidence that would raise a disputed issue for trial as to whether, as of the date the contract was formed, a year of Dauphinee's post-termination earnings would constitute a reasonable forecast of RMS's losses. Indeed, the court cannot discern how Dauphinee's compensation bears any relationship to RMS's losses. In purporting to measure its damages by Dauphinee's future compensation, RMS is really seeking to enforce a forfeiture or penalty provision.

The court concludes that Dauphinee is entitled to summary judgment dismissing the liquidated damages claim to the extent that it seeks damages measured by Dauphinee's post-termination competition.

4.      Misappropriation of Trade Secrets

In its breach of contract claim, as the court understands it, RMS contends that Dauphinee breached the 2002 Noncompetition and Nondisclosure Agreement by

5

violating the noncompete clause, by violating the covenant not to disclose information designated as confidential under the agreement, and by not surrendering RMS business records upon his 2007 resignation. In Count II of its complaint, RMS brings an independent claim under 10 M.R.S. § 1541 et seq., contending that Dauphinee has also misappropriated trade secrets subject to protection under that statute.

Under the statute, a trade secret is defined as:

information, including, but not limited to, a formula, pattern, compilation, program, device, method, technique or process, that:

A. Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

B. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

10 M.R.S. § 1542(4). *See Spottiswoode v. Levine*, 1999 ME 79, ¶ 27, 730 A.2d 166, 174-75.

The information sought to be protected here does not remotely resemble a "formula, pattern, compilation, program, device, method, technique or process," but that does not in and of itself necessarily preclude it from constituting a trade secret under the statute.

In *Spottiswoode*, the Law Court sets forth various factors to be considered in determining whether information derives independent economic value from not being generally known and various other factors to be considered in determining whether the information is the subject of reasonable efforts to maintain secrecy. *See* 1999 ME 79, ¶ 27 nn.6 & 7, 730 A.2d at 175 nn. 6 & 7. Some of those factors overlap—*e.g.*, the extent of the measures taken by plaintiff to guard the secrecy of the information. *Id.*

Dauphinee has submitted unrebutted evidence that at least some of the information for which RMS claims trade secret protection consists of lists of realtors in

6

the Bath-Brunswick area. *See* Dep. Ex. 12. All of these realtors advertise to the public and the identities of these agencies (and the individual realtors who work at those agencies) are easily ascertainable from other sources.[2] In addition, Dauphinee has offered evidence that, while RMS required some of its loan originators to sign covenants not to compete, it did not require all of its loan originators to sign such contracts. Finally, Dauphinee points out that the designated representative at RMS testified as follows in answer to the question "How do you keep track of what your competitors are doing in terms of rate and terms of how to compete with them?":

> A. There is no proprietary information. Judges have ruled on that continually over the last ten years. It's a standardized industry with no proprietary information. Everything is available to everyone.

RMS Deposition at 106.

Based on this showing, it is incumbent upon RMS to come forward with some evidence demonstrating that there are disputed issues for trial as to whether the information it contends Dauphinee appropriated has independent economic value from not being generally known and was the subject of reasonable efforts to maintain secrecy. It has not done so. Instead, RMS argues that Dauphinee has allegedly disclosed or at least retained documents that fit the description of "confidential information" under the 2002 Noncompetition and Nondisclosure Agreement. However, as RMS itself concedes, information protected by a contractual confidentiality agreement need not qualify as a trade secret under 10 M.R.S. § 1542 in order for the contract to be enforceable. Plaintiff's memorandum in opposition to summary judgment dated October 7, 2008 at 6, citing *Bernier v. Merrill Air Engineers*, 2001 ME 17, ¶ 15, 770 A.2d 97, 103. It follows that RMS must make an independent factual showing

---

[2] Deposition Ex. 12 is a document for which confidential treatment is claimed and therefore is filed under seal. The court can see no justification for this treatment.

7

that trade secrets are involved in order to avoid summary judgment on its statutory trade secret claim.

RMS also contends that the court's review of certain other exhibits would demonstrate that those documents should be entitled to trade secret protection. Plaintiff's memorandum dated October 7, 2008 at 15 (referring to Deposition Exs. 35 & 36). The court has undertaken such a review of the documents in question—lists of borrowers, addresses, loan types, interest rates, and mortgage terms—and, while those documents appear to fall within the category of information made confidential by the 2002 Noncompetition Agreement, the court sees no evidence that the information contained therein derives independent economic value from confidentiality or has been subjected to reasonable measures to protect its secrecy.

Finally, RMS argues that the "no proprietary information" testimony relied on by Dauphinee has been taken out of context -- without adequately explaining why that testimony does not mean what it says.

Dauphinee is entitled to summary judgment on the statutory trade secrets claim.


5.    Conversion

In Count III of its complaint, RMS contends that Dauphinee's conduct constitutes a conversion of RMS's confidential business information, its property and funds, and its proprietary rights. In its opposition to summary judgment, however, RMS focuses solely on Dauphinee's alleged retention of customer lists and other documents.

The tort of conversion applies to tangible property—chattels. *See Restatement Second Torts* § 222A. To the extent that RMS is arguing that Dauphinee has converted RMS's interest in information designated as confidential under the 2002 Noncompetition Agreement, an interest in information is not protected by a conversion

8

action. *See Northeast Coating Technologies, Inc. v. Vacuum Metallurgical Co. Ltd.*, 684 A.2d 1322, 1324 (Me. 1996). To the extent that a conversion action can be brought with respect to intangible property, such actions are limited to documents embodying legal rights to intangible property, such as promissory notes. *Id.*, citing *Restatement Second of Torts* § 242. The documents in question here do not fall within that category.

Dauphinee is entitled to summary judgment dismissing RMS's conversion claim.


6.      Fraud

In Count IV of its complaint, RMS asserts a cause of action for fraud, alleging that Dauphinee fraudulently agreed to an extension of the 2002 Noncompetition Agreement in May 2006 when he did not intend to abide by that agreement at that time.[3]

To prove that Dauphinee committed fraud, RMS must demonstrate (1) that Dauphinee made a false representation, (2) of a material fact, (3) with knowledge of its falsity or in reckless disregard of whether it was true or false, (4) for the purpose of inducing RMS to act or to refrain from acting in reliance on the representation, and (5) that RMS justifiably relied on its representation, causing it economic loss. *Brawn v. Oral Surgery Associates*, 2003 ME 11, ¶ 21, 819 A.2d 1014, 1026.

RMS essentially argues that if Dauphinee entered a contract with knowledge that he intended to breach the contract, that constitutes a basis for a tort claim of intentional misrepresentation or fraud as well as the basis for a breach of contract claim. Accepting this premise for purposes of argument and accepting for purposes of summary

---

[3] As noted above, it is disputed whether the 2002 Noncompetition Agreement was extended in May 2006, but the court has already ruled that this issue presents a factual dispute for trial. For purposes of this discussion, the court assumes that RMS can prove that Dauphinee agreed to an extension of the Noncompetition Agreement in 2006 and the question is whether he did so fraudulently.

9

judgment that Dauphinee breached noncompetition and nondisclosure provisions in the 2002 agreement that were extended in May 2006, the question is whether RMS has offered any evidence that Dauphinee acted fraudulently in May 2006 by making representations as to his intentions that he knew were false. RMS has offered no direct evidence that Dauphinee did not have the intention of complying with the Noncompetition Agreement in 2006. However, it argues that a jury could infer that Dauphinee knowingly and falsely represented his intentions from the manner in which he allegedly breached the noncompetition provisions a year later.

The court is not inclined to conclude that a breach of contract claim can be converted into a fraud claim merely by asserting that an intent to breach the contract at its inception can be proven circumstantially by a subsequent breach. Some evidence would appear to be required to suggest that Dauphinee (1) knew that he was agreeing to an extension of the noncompetition agreement, (2) contemporaneously harbored the intention to leave RMS in the future, and (3) intended to disregard the noncompetition agreement at that time. However, for purposes of summary judgment, the court concludes that Dauphinee has not made a sufficient factual showing to negate this claim, thereby requiring RMS to offer evidence of fraud. Accordingly, the court will deny Dauphinee's motion for summary judgment as to the fraud claims. This is an issue that may be deserving of additional scrutiny if raised on a motion pursuant to Rule 50 at the close of plaintiff's evidence.

The entry shall be:

Defendant's motion for summary judgment is granted as to Counts II and III of the Complaint and as to plaintiff's claim for liquidated damages but is denied in all other respects. The clerk is directed to incorporate this judgment by reference in the docket pursuant to M.R.Civ.P. 79(a).

10

DATED: March 23, 2009

Thomas D. Warren
Justice, Maine Superior Court

11

ERIC UHL ESQ
400 CONGRESS STREET   4TH FLOOR
PORTLAND ME 04101

*Defendant*

SETH BREWSTER ESQ
PO BOX 586
PORTLAND ME 04112

*Plaintiff*

STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                         CIVIL ACTION
                                                        DOCKET NO. CV-07-359

RESIDENTIAL MORTGAGE
SERVICES, INC.,

        Plaintiff,

        v.                                              ORDER

GREGORY DAUPHINEE,

        Defendant.


Before the court are two motions by plaintiff Residential Mortgage

Services Inc. (RMS): (1) a renewed motion for judgment as a matter of law and (2)

a motion for a new trial.[1]


A. Rule 50 motion

        1. In almost every respect RMS's motion for judgment as a matter of law depends

on a recitation of facts construed in the light most favorable to RMS and ignores the

principle that the jury was not required to adopt RMS's version of the facts. Every

aspect of this case was hotly disputed, including but limited to the following: (1)

whether RMS's stated purpose in seeking noncompetition agreements was accurate or

whether those agreements (obtained from some of its mortgage brokers but not others)

were actually intended to give RMS leverage in disputes with its employees; (2)

whether the information that RMS contended was proprietary had in fact been treated

---

[1] Defendant Gregory Dauphinee has also sought leave to file a surreply memorandum in
response to the reply memorandum filed by RMS on its motion for judgment as a matter of law.
That request is granted. RMS's reply memorandum contains a "law of the case" argument that
was not raised in its original memorandum, and Dauphinee is entitled to address that
argument.

as confidential or was instead available from public sources; (3) whether RMS had lived up to certain promises it allegedly had made to Dauphinee; and (4) whether Dauphinee had in fact sought to solicit RMS clients or use confidential information after he left RMS. The jury could have found for either party on these issues.

2. On this issue most pertinent to the jury's verdict, RMS treats the May 19, 2006 document (plaintiff's Ex. 4) as a simple extension of the original 2002 Noncompetition and Nondisclosure Agreement (plaintiff's Ex. 1). To be sure, there is language in the May 2006 document that supports such an interpretation. However, there was also contrary evidence. Dauphinee had resigned and left the employ of RMS in May 2006 and was thereafter rehired by RMS after working several days at another company. The May 2006 document relied on by RMS was signed upon Dauphinee's rehiring, set forth a long list of the terms upon which he was rehired, and was accompanied by a cover letter signed by Mr. Seely stating that the document listed the terms of Dauphinee's employment contract and that the actual employment contract "will be forthcoming."[2]

The May 2006 document was not unambiguous and was not an integrated contract.[3] While the court recalls there was a dispute at trial as to whether a subsequent employment contract was ever prepared or provided to Dauphinee, it was undisputed that no subsequent employment contract was ever signed or agreed to. Thus, as the

---

[2] The cover letter was introduced by defendant at trial and also appears as Exhibit 5 to Defendant's Statement of Material Facts on his motion for summary judgment. Notably, RMS offered the May 2006 document in evidence at trial without the cover letter. The recitation of facts contained in RMS's Rule 50 motion also conspicuously omits any reference to the cover letter.

[3] For example, while RMS quotes a portion of the the May 2006 document stating that Dauphinee's retention bonus is an "addendum to Dauphinee's Nondisclosure NonCompete, as originally signed, " the May 2006 document goes on to state that the retention bonus will be included in the liquidated damages portion "of the employment contract." The 2002 Noncompetition agreement, however, expressly states that it is not an employment contract. The only employment contract was the document which the May 2006 cover letter promised would be forthcoming – but which never in fact came forth.

2

court found at the summary judgment stage, there was a factual issue at trial as to whether the May 2006 document constituted a binding contract or a non-binding agreement to agree. In its summary judgment papers, RMS agreed this was a jury question.[4] The jury was entitled to find against RMS on this issue.

2. Based on the evidence at trial, the jury was also entitled to find (1) that there was no meeting of the minds between the parties as to the terms of the contract and (2) that there was no mutual assent to be bound by the May 2006 document in the absence of a formal contract. If there was no meeting of the minds or no mutual assent to be bound by the May 2006 document, then the jury was correct in finding that there was no contract in effect when Dauphinee resigned for a second time on June 20, 2007. In this connection, it bears emphasis that the noncompetition provisions in Dauphinee's original 2002 agreement were to last for only 6 months after the termination of Dauphinee's employment. Although he was swiftly rehired, Dauphinee's resignation in May 2006 qualified as a termination of employment under the 2002 agreement. As a result, it was possible to find that Dauphinee was no longer subject to the 2002 noncompetition provisions – unless the May 2006 document constituted a binding agreement to extend those provisions. The jury found that it did not.

3. There was also a dispute at trial as to whether Dauphinee had received any consideration for signing the 2002 noncompetition and nondisclosure agreement, which he testified was presented to him on a "take it or leave it" basis sometime after he had been hired and which he testified he had received no additional benefit for signing. The jury was instructed that one of the requirements for formation of a contract was that

---

[4] In its Memorandum in Opposition to Summary Judgment dated October 7, 2008 at 10 n.7 RMS stated as follows:

> Of course, whether RMS and Dauphinee intended that a further written contract was required before there was a conclusive agreement is a jury question and not appropriate for resolution on summary judgment.

3

each party receive something of value as part of the bargain. On this issue, as on all the other issues at the trial, a reasonable jury was not required to find in favor of RMS.

4. Assuming that RMS had prevailed on the issue of whether a contract containing noncompetition and nondisclosure provisions was in effect at the time Dauphinee left RMS in June 2007, RMS still would not have been entitled to judgment as a matter of law for a number of other reasons. First, if the May 2006 document constituted a binding contract, the jury could have found Dauphinee's obligations under that contract had been discharged because RMS had materially breached its own obligations under that contract before Dauphinee left the employ of RMS in June 2007. The jury never reached this issue (question # 2 on the jury verdict form).

RMS argues that the provisions of the May 26 document which Dauphinee contends were breached by RMS did not need to be complied with because, according to RMS, those provisions were independent of Dauphinee's obligations. However, as acknowledged in the only case on which RMS relies, Wilson v. Wilson, 157 Me. 119, 170 A.2d 679 (Me. 1961), a "material" breach discharges further performance by the non-breaching party.[5] It was at least a jury question whether, if there were breaches by RMS, those breaches were material.

Beyond that hurdle, there were also factual disputes as to whether – assuming that there was a contract and that RMS had not committed a material breach – Dauphinee had disclosed or used information that was in fact confidential or had solicited his former customers. RMS offered evidence that such violations had occurred,

---

[5] Specifically, the Wilson case quoted the following excerpt from Williston on Contracts:
> A breach of a separate collateral promise of minor importance will not justify refusal by the other party to perform if the main promise to him has been or is being substantially performed. On the other hand, even though the breach occurs after part performance, if it is of such a material or essential character as to go to the root of the contract, further performance by the injured party is excused.

157 Me. at 127, 170 A.2d at 684.

and Dauphinee offered contrary evidence. On this issue as well the jury would not have been required to find in favor of RMS, and judgment as a matter of law cannot be entered for RMS.

5. In its reply memorandum, RMS argues that the court was obliged to follow Chief Justice Humphrey's July 26, 2007 order as the law of the case. The court disagrees for at least four reasons. First, since the July 26, 2007 order ultimately denied RMS's motion for a TRO, the portion of the July 26, 2007 order relied upon by RMS is dicta. See C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 664 (dicta not entitled to law of the case treatment). Second, trial court rulings (as opposed to appellate court rulings) are always subject to reconsideration, and this is particularly true of preliminary rulings. See id. § 4478.1 at 692-93, 698 ("An order granting or denying a preliminary injunction . . . rests on tentative findings that are subject to reconsideration, either at trial or during the later stages of pretrial proceedings"). Third, the July 26, 2007 order was based on a paper record, and the court at that time did not have the benefit of testimony with respect to the facts surrounding the original 2002 agreement, the May 2006 termination and rehiring, and the circumstances surrounding the May 26, 2006 document.[6] Finally, to require the court to follow the tentative findings in the July 26, 2007 order would be inconsistent with Dauphinee's right to a jury trial on the factual issues in the case.

---

[6] The court agrees that on a paper record, RMS's arguments look stronger because the wording in the May 2006 document, which RMS drafted, is susceptible to the interpretation that the parties were agreeing to extend the 2002 Noncompetition agreement. As set forth previously, however, the May 2006 document was not an integrated contract, was ambiguous in certain respects, and was accompanied by a cover letter that the jury could have found made any understandings in the May 2006 agreement contingent on a subsequent formal contract.

B. Motion for a New Trial

1. In support of its motion for a new trial, RMS argues that the first question on the jury verdict form required the jury to determine to what extent the non-competition agreement at issue in this case was enforceable. In making this argument, RMS does not accurately portray the jury instructions or the jury verdict form in this case.

The jury was instructed as follows:

> In this action plaintiff Residential Mortgage Services Inc. (RMS) has brought this action against defendant Gregory Dauphinee for breach of contractual non-competition and non-disclosure provisions that RMS contends were in effect on June 20, 2007, the date Dauphinee left RMS.
>
> On this claim RMS has the burden of proof and must initially prove by a preponderance of the evidence that as of June 20, 2007 there was a contract in effect between RMS and Gregory Dauphinee that imposed non-competition and nondisclosure obligations upon Dauphinee after he left RMS.

The first issue for the jury to consider, therefore, was the existence of a contract on June 20, 2007 and on that issue the jury was instructed as follows:

EXISTENCE OF CONTRACT

> You may find that a contract existed if you find by a preponderance of the evidence:
>
> – that there was an offer;
> – that there was acceptance of that offer;
> – that there was a meeting of the minds of the parties as to the terms of the contract and mutual assent to be bound by those terms of the contract; and
> – that each party received, or would receive, something of value from the contract.
>
> A declaration of intention to enter into an agreement at some time in the future, even if the terms are stated with some specificity, is not an offer which can be accepted to form a binding contract. However, if there has been a meeting of the minds and both parties intend at that stage to be bound by terms that are mutually understood and agreed

6

to, a contract is not invalid just because the parties may have also contemplated that a more formal written contract would be drafted and signed in the future.

If you find that RMS has not proven that contractual non-competition or non-disclosure provisions were still in effect on June 20, 2007, then this will result in a verdict for Gregory Dauphinee.

Only if the jurors found that a contract was in effect when Dauphinee left RMS were they to proceed to the question of how to interpret the conrtract. Thus the immediately succeeding instruction was as follows:

If you find that there was a contract in effect on June 20, 2007 that imposed non-competition or nondisclosure obligations on Dauphinee, you must then consider how to interpret the terms and conditions of that contract in light of Maine law governing such contracts and whether either Dauphinee or RMS materially breached any of the terms of their contract.

The first question on the jury verdict form similarly focused on whether a contract imposing non-competition or nondisclosure obligations was in effect on June 20, 2007. Specifically, it asked:

1. As of June 20, 2007 was there a contract in effect between Residential Mortgage Services (RMS) and Gregory Dauphinee that imposed enforceable non-competition and nondisclosure obligations upon Dauphinee after he left Residential Mortgage Services?

Yes_____          No_____

In light of the instructions quoted above, the focus of the first question was not whether a contract was enforceable but whether or not a contract was in effect. Moreover, the court specifically instructed the jury that a non-competition agreement was enforceable "to prohibit an employee who has had substantial contact with an employer's customers from soliciting and pursuing customers with whom the employee previously has had contact or customers who are known to the employee as a

7

result of confidential documents obtained from the employer (as opposed to customers who can be identified from publicly available information)." As a result, contrary to the argument now advanced by RMS, the jury was not asked to determine enforceability in connection with question 1 on the jury verdict form.

2. Because the jury found against RMS on the issue of whether a contract was in effect, it never reached the second question on the verdict form – whether RMS had materially breached the contract – or the third question – whether Dauphinee had materially breached the contract. On the latter issue RMS argued at trial, citing Brignull v. Albert, 666 A.2d 82 (Me. 1995), that the jury should have been instructed that the 2002 noncompetition agreement was reasonable in its entirety as a matter of law. The court explained on the record at trial its basis for distinguishing Brignull and gave a more limited instruction, relying on the Law Court's most recent decision in Bernier v. Merrill Air Engineers, 2001 ME 17, 770 A.2d 97.

In Bernier the Law Court stated in pertinent part:

> An employer, under a proper restrictive agreement, can prevent an employee from using his trade or business secrets and other confidential knowledge gathered in the course of employment, and from enticing away old customers . . . . Proper restrictive covenants cannot preclude former employees from "following any trade or calling from which he is fitted and from which he may earn his livelihood" or "exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment." . . . To be enforceable the "agreement must impose no undue hardship upon the employee and be no wider in its scope than is reasonably necessary for the protection of the business of the employer."

2001 ME 17 ¶¶ 15, 17, 770 A.2d at 103, quoting Roy v. Bolduc, 140 Me. 103, 107, 34 A.2d 479, 480-81 (1943). Whether the court's instruction as to the reasonable scope of the noncompetition agreement at issue in this case was correct, assuming that the jury had found that agreement to be still in effect, is a question that need not be revisited because

8

the jury determined that RMS had not proven that the 2002 noncompetition agreement was in effect .

3. The second argument advanced by RMS on its motion for a new trial is that the court should have disqualified juror no. 72 or should have engaged in a voir dire of that juror.[7] The court disagrees.

First, counsel for RMS originally agreed to the course of action adopted by the court and the instruction that was given by the court to the jury as a whole that day. It was only the following day, presumably after the import of the juror's comment to the court officer had sunk in, that counsel sought the disqualification of juror no. 72. As stated on the record, the court cannot find it to be improper for a juror to form an opinion during a witness's testimony that the witness is not telling the truth. There is no evidence that juror no. 72 prematurely discussed his views with other jurors, and the jurors were repeatedly instructed not to discuss the case among themselves until jury deliberations began. The record also established that juror no. 72's comment to the court officer was not made in the presence of other jurors.

RMS argues that there is evidence that juror no. 72 was influenced by extraneous information. The only basis for this contention is that the juror said that he had previously worked in a bank. Jurors are not required to leave their common sense or their life experiences behind them when they begin hearing the evidence.[8] The fact that a juror had previous experience in a bank does not remotely qualify as the kind of extraneous information that would require the court to set aside a verdict.

---

[7] The court does not specifically recall whether, after outright disqualification was denied, defense counsel then requested voir dire of juror no. 72. For purposes of this order, the court accepts defense counsel's representation that such a request was made.

[8] At the time of jury selection, neither party requested that jurors be asked whether they had any banking experience.

9

Nor was the court required to single out juror no. 72 for the voir dire proposed by RMS – "the determine the basis of his opinion." The court is simply not entitled to ask a juror to explain any views, preliminary or otherwise, that the juror may have formed about a case. Making such an inquiry would have placed the juror on the spot and would have run the risk of suggesting that the court agreed or disagreed with the juror's preliminary evaluation of the evidence. If there had been evidence that the juror had been exposed to extraneous information (as opposed to drawing on life experience), voir dire inquiry about the extraneous information would have been appropriate. That was not the situation in this case.

The entry shall be:

Defendant's motions for judgment as a matter of law and for a new trial are denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: December _3_, 2009

Thomas D. Warren
Justice, Superior Court

10

```
                    MAINE JUDICIAL INFORMATION SYSTEM
                    CUMBERLAND COUNTY SUPERIOR COURT
                    PAGE A  -  ATTORNEY BY CASE VIEW

RESIDENTIAL MORTGAGE SERVICES INC VS GREGORY DAUPHINEE
UTN:AOCSsr  -2007-0070268                 CASE #:PORSC-CV-2007-00359
=====================================================================
SEL VD                          REPRESENTATION TYPE          DATE
01 0000003741 ATTORNEY:BREWSTER, SETH
ADDR:ONE PORTLAND SQUARE PO BOX 586 PORTLAND ME 04112-0586
   F FOR:RESIDENTIAL MORTGAGE SERVICES INC    PL      RTND   06/22/2007

02 000000007244 ATTORNEY:UHL, ERIC J
ADDR:D/B/A MOSS SHAPIRO 400 CONGRESS ST PORTLAND ME 04112
   F FOR:GREGORY DAUPHINEE                    DEF     RTND   07/16/2007

03 00000000V1 ATTORNEY:ATTORNEY, VISITING
ADDR:- -
   F FOR:GREGORY DAUPHINEE                    DEF     RTND   07/20/2007

          Enter Option: A=Add, B+Sel=Browse, M=More, R+Sel=RltnEdit:
Select the EXIT KEY for page selection line.
```

STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                        CIVIL ACTION
                                                       DOCKET NO. CV-07-359

RESIDENTIAL MORTGAGE
SERVICES, INC.,

            Plaintiff,

      v.                                               ORDER

GREGORY DAUPHINEE,

            Defendant.


It has come to the court's attention via a letter from counsel for defendant

that the court's December 3, 2009 order incorrectly designates the plaintiff as the

defendant in two places.[1] In re-reading the order, the court found one additional

error. Accordingly, the December 3, order is amended as follows:

      1. Footnote 7 on page 9 should read as follows (changes noted):

      "The court does not specifically recall whether, after outright disqualification
      was denied, ~~defense~~ plaintiff's counsel then requested voir dire of juror no. 72. For
      purposes of this order, the court accepts ~~defense~~ counsel's representation that such a
      request was made."

      2. The first sentence on page 10 should read as follows:

      Nor was the court required to single out juror no. 72 for the voir dire

proposed by RMS – "~~the~~ to determine the basis of his opinion."


      3. The conclusion on page 10 should read as follows:

      "~~Defendant's~~ Plaintiff's motions for judgment as a matter of law and for a new

trial are denied."

      A complete copy of the order, as amended, is attached.

---

[1] Counsel for plaintiff has advised the clerk's office that plaintiff does not wish to be heard on
this issue.

Dated: December 11, 2009

_____
Thomas D. Warren
Justice, Superior Court

STATE OF MAINE                                  SUPERIOR COURT
CUMBERLAND, ss.                                 CIVIL ACTION
                                                DOCKET NO. CV-07-359

RESIDENTIAL MORTGAGE
SERVICES, INC.,

            Plaintiff,
                                                AMENDED
      v.                                        ORDER

GREGORY DAUPHINEE,

            Defendant.


      Before the court are two motions by plaintiff Residential Mortgage

Services Inc. (RMS): (1) a renewed motion for judgment as a matter of law and (2)

a motion for a new trial.[1]


A. Rule 50 motion

      1. In almost every respect RMS's motion for judgment as a matter of law depends

on a recitation of facts construed in the light most favorable to RMS and ignores the

principle that the jury was not required to adopt RMS's version of the facts. Every

aspect of this case was hotly disputed, including but limited to the following: (1)

whether RMS's stated purpose in seeking noncompetition agreements was accurate or

whether those agreements (obtained from some of its mortgage brokers but not others)

were actually intended to give RMS leverage in disputes with its employees; (2)

whether the information that RMS contended was proprietary had in fact been treated

---

[1] Defendant Gregory Dauphinee has also sought leave to file a surreply memorandum in
response to the reply memorandum filed by RMS on its motion for judgment as a matter of law.
That request is granted. RMS's reply memorandum contains a "law of the case" argument that
was not raised in its original memorandum, and Dauphinee is entitled to address that
argument.

as confidential or was instead available from public sources; (3) whether RMS had lived up to certain promises it allegedly had made to Dauphinee; and (4) whether Dauphinee had in fact sought to solicit RMS clients or use confidential information after he left RMS. The jury could have found for either party on these issues.

2. On this issue most pertinent to the jury's verdict, RMS treats the May 19, 2006 document (plaintiff's Ex. 4) as a simple extension of the original 2002 Noncompetition and Nondisclosure Agreement (plaintiff's Ex. 1). To be sure, there is language in the May 2006 document that supports such an interpretation. However, there was also contrary evidence. Dauphinee had resigned and left the employ of RMS in May 2006 and was thereafter rehired by RMS after working several days at another company. The May 2006 document relied on by RMS was signed upon Dauphinee's rehiring, set forth a long list of the terms upon which he was rehired, and was accompanied by a cover letter signed by Mr. Seely stating that the document listed the terms of Dauphinee's employment contract and that the actual employment contract "will be forthcoming."[2]

The May 2006 document was not unambiguous and was not an integrated contract.[3] While the court recalls there was a dispute at trial as to whether a subsequent employment contract was ever prepared or provided to Dauphinee, it was undisputed that no subsequent employment contract was ever signed or agreed to. Thus, as the

---

[2] The cover letter was introduced by defendant at trial and also appears as Exhibit 5 to Defendant's Statement of Material Facts on his motion for summary judgment. Notably, RMS offered the May 2006 document in evidence at trial without the cover letter. The recitation of facts contained in RMS's Rule 50 motion also conspicuously omits any reference to the cover letter.

[3] For example, while RMS quotes a portion of the the May 2006 document stating that Dauphinee's retention bonus is an "addendum to Dauphinee's Nondisclosure NonCompete, as originally signed, " the May 2006 document goes on to state that the retention bonus will be included in the liquidated damages portion "of the employment contract." The 2002 Noncompetition agreement, however, expressly states that it is not an employment contract. The only employment contract was the document which the May 2006 cover letter promised would be forthcoming – but which never in fact came forth.

2

court found at the summary judgment stage, there was a factual issue at trial as to whether the May 2006 document constituted a binding contract or a non-binding agreement to agree. In its summary judgment papers, RMS agreed this was a jury question.[4] The jury was entitled to find against RMS on this issue.

2. Based on the evidence at trial, the jury was also entitled to find (1) that there was no meeting of the minds between the parties as to the terms of the contract and (2) that there was no mutual assent to be bound by the May 2006 document in the absence of a formal contract. If there was no meeting of the minds or no mutual assent to be bound by the May 2006 document, then the jury was correct in finding that there was no contract in effect when Dauphinee resigned for a second time on June 20, 2007. In this connection, it bears emphasis that the noncompetition provisions in Dauphinee's original 2002 agreement were to last for only 6 months after the termination of Dauphinee's employment. Although he was swiftly rehired, Dauphinee's resignation in May 2006 qualified as a termination of employment under the 2002 agreement. As a result, it was possible to find that Dauphinee was no longer subject to the 2002 noncompetition provisions – unless the May 2006 document constituted a binding agreement to extend those provisions. The jury found that it did not.

3. There was also a dispute at trial as to whether Dauphinee had received any consideration for signing the 2002 noncompetition and nondisclosure agreement, which he testified was presented to him on a "take it or leave it" basis sometime after he had been hired and which he testified he had received no additional benefit for signing. The jury was instructed that one of the requirements for formation of a contract was that

---

[4] In its Memorandum in Opposition to Summary Judgment dated October 7, 2008 at 10 n.7 RMS stated as follows:

Of course, whether RMS and Dauphinee intended that a further written contract was required before there was a conclusive agreement is a jury question and not appropriate for resolution on summary judgment.

3

each party receive something of value as part of the bargain. On this issue, as on all the other issues at the trial, a reasonable jury was not required to find in favor of RMS.

4. Assuming that RMS had prevailed on the issue of whether a contract containing noncompetition and nondisclosure provisions was in effect at the time Dauphinee left RMS in June 2007, RMS still would not have been entitled to judgment as a matter of law for a number of other reasons. First, if the May 2006 document constituted a binding contract, the jury could have found Dauphinee's obligations under that contract had been discharged because RMS had materially breached its own obligations under that contract before Dauphinee left the employ of RMS in June 2007. The jury never reached this issue (question # 2 on the jury verdict form).

RMS argues that the provisions of the May 26 document which Dauphinee contends were breached by RMS did not need to be complied with because, according to RMS, those provisions were independent of Dauphinee's obligations. However, as acknowledged in the only case on which RMS relies, Wilson v. Wilson, 157 Me. 119, 170 A.2d 679 (Me. 1961), a "material" breach discharges further performance by the non-breaching party.[5] It was at least a jury question whether, if there were breaches by RMS, those breaches were material.

Beyond that hurdle, there were also factual disputes as to whether – assuming that there was a contract and that RMS had not committed a material breach – Dauphinee had disclosed or used information that was in fact confidential or had solicited his former customers. RMS offered evidence that such violations had occurred,

---

[5] Specifically, the Wilson case quoted the following excerpt from Williston on Contracts:
> A breach of a separate collateral promise of minor importance will not justify refusal by the other party to perform if the main promise to him has been or is being substantially performed. On the other hand, even though the breach occurs after part performance, if it is of such a material or essential character as to go to the root of the contract, further performance by the injured party is excused.

157 Me. at 127, 170 A.2d at 684.

4

and Dauphinee offered contrary evidence. On this issue as well the jury would not have been required to find in favor of RMS, and judgment as a matter of law cannot be entered for RMS.

5. In its reply memorandum, RMS argues that the court was obliged to follow Chief Justice Humphrey's July 26, 2007 order as the law of the case. The court disagrees for at least four reasons. First, since the July 26, 2007 order ultimately denied RMS's motion for a TRO, the portion of the July 26, 2007 order relied upon by RMS is dicta. See C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478 at 664 (dicta not entitled to law of the case treatment). Second, trial court rulings (as opposed to appellate court rulings) are always subject to reconsideration, and this is particularly true of preliminary rulings. See id. § 4478.1 at 692-93, 698 ("An order granting or denying a preliminary injunction . . . rests on tentative findings that are subject to reconsideration, either at trial or during the later stages of pretrial proceedings"). Third, the July 26, 2007 order was based on a paper record, and the court at that time did not have the benefit of testimony with respect to the facts surrounding the original 2002 agreement, the May 2006 termination and rehiring, and the circumstances surrounding the May 26, 2006 document.[6] Finally, to require the court to follow the tentative findings in the July 26, 2007 order would be inconsistent with Dauphinee's right to a jury trial on the factual issues in the case.

---

[6] The court agrees that on a paper record, RMS's arguments look stronger because the wording in the May 2006 document, which RMS drafted, is susceptible to the interpretation that the parties were agreeing to extend the 2002 Noncompetition agreement. As set forth previously, however, the May 2006 document was not an integrated contract, was ambiguous in certain respects, and was accompanied by a cover letter that the jury could have found made any understandings in the May 2006 agreement contingent on a subsequent formal contract.

5

B. Motion for a New Trial

1. In support of its motion for a new trial, RMS argues that the first question on the jury verdict form required the jury to determine to what extent the non-competition agreement at issue in this case was enforceable. In making this argument, RMS does not accurately portray the jury instructions or the jury verdict form in this case.

The jury was instructed as follows:

> In this action plaintiff Residential Mortgage Services Inc. (RMS) has brought this action against defendant Gregory Dauphinee for breach of contractual non-competition and non-disclosure provisions that RMS contends were in effect on June 20, 2007, the date Dauphinee left RMS.
>
> On this claim RMS has the burden of proof and must initially prove by a preponderance of the evidence that as of June 20, 2007 there was a contract in effect between RMS and Gregory Dauphinee that imposed non-competition and nondisclosure obligations upon Dauphinee after he left RMS.

The first issue for the jury to consider, therefore, was the existence of a contract on June 20, 2007 and on that issue the jury was instructed as follows:

EXISTENCE OF CONTRACT

> You may find that a contract existed if you find by a preponderance of the evidence:
>
> – that there was an offer;
> – that there was acceptance of that offer;
> – that there was a meeting of the minds of the parties as to the terms of the contract and mutual assent to be bound by those terms of the contract; and
> – that each party received, or would receive, something of value from the contract.
>
> A declaration of intention to enter into an agreement at some time in the future, even if the terms are stated with some specificity, is not an offer which can be accepted to form a binding contract. However, if there has been a meeting of the minds and both parties intend at that stage to be bound by terms that are mutually understood and agreed

6

to, a contract is not invalid just because the parties may have also contemplated that a more formal written contract would be drafted and signed in the future.

If you find that RMS has not proven that contractual non-competition or non-disclosure provisions were still in effect on June 20, 2007, then this will result in a verdict for Gregory Dauphinee.

Only if the jurors found that a contract was in effect when Dauphinee left RMS were they to proceed to the question of how to interpret the conrtract. Thus the immediately succeeding instruction was as follows:

If you find that there was a contract in effect on June 20, 2007 that imposed non-competition or nondisclosure obligations on Dauphinee, you must then consider how to interpret the terms and conditions of that contract in light of Maine law governing such contracts and whether either Dauphinee or RMS materially breached any of the terms of their contract.

The first question on the jury verdict form similarly focused on whether a contract imposing non-competition or nondisclosure obligations was in effect on June 20, 2007. Specifically, it asked:

1. As of June 20, 2007 was there a contract in effect between Residential Mortgage Services (RMS) and Gregory Dauphinee that imposed enforceable non-competition and nondisclosure obligations upon Dauphinee after he left Residential Mortgage Services?

Yes_____        No_____

In light of the instructions quoted above, the focus of the first question was not whether a contract was enforceable but whether or not a contract was in effect. Moreover, the court specifically instructed the jury that a non-competition agreement was enforceable "to prohibit an employee who has had substantial contact with an employer's customers from soliciting and pursuing customers with whom the employee previously has had contact or customers who are known to the employee as a

7

result of confidential documents obtained from the employer (as opposed to customers who can be identified from publicly available information)." As a result, contrary to the argument now advanced by RMS, the jury was not asked to determine enforceability in connection with question 1 on the jury verdict form.

2. Because the jury found against RMS on the issue of whether a contract was in effect, it never reached the second question on the verdict form – whether RMS had materially breached the contract – or the third question – whether Dauphinee had materially breached the contract. On the latter issue RMS argued at trial, citing Brignull v. Albert, 666 A.2d 82 (Me. 1995), that the jury should have been instructed that the 2002 noncompetition agreement was reasonable in its entirety as a matter of law. The court explained on the record at trial its basis for distinguishing Brignull and gave a more limited instruction, relying on the Law Court's most recent decision in Bernier v. Merrill Air Engineers, 2001 ME 17, 770 A.2d 97.

In Bernier the Law Court stated in pertinent part:

> An employer, under a proper restrictive agreement, can prevent an employee from using his trade or business secrets and other confidential knowledge gathered in the course of employment, and from enticing away old customers . . . . Proper restrictive covenants cannot preclude former employees from "following any trade or calling from which he is fitted and from which he may earn his livelihood" or "exercising the skill and general knowledge he has acquired or increased through experience or even instructions while in the employment." . . . To be enforceable the "agreement must impose no undue hardship upon the employee and be no wider in its scope than is reasonably necessary for the protection of the business of the employer."

2001 ME 17 ¶¶ 15, 17, 770 A.2d at 103, quoting Roy v. Bolduc, 140 Me. 103, 107, 34 A.2d 479, 480-81 (1943). Whether the court's instruction as to the reasonable scope of the noncompetition agreement at issue in this case was correct, assuming that the jury had found that agreement to be still in effect, is a question that need not be revisited because

8

the jury determined that RMS had not proven that the 2002 noncompetition agreement was in effect .

3. The second argument advanced by RMS on its motion for a new trial is that the court should have disqualified juror no. 72 or should have engaged in a voir dire of that juror.[7] The court disagrees.

First, counsel for RMS originally agreed to the course of action adopted by the court and the instruction that was given by the court to the jury as a whole that day. It was only the following day, presumably after the import of the juror's comment to the court officer had sunk in, that counsel sought the disqualification of juror no. 72. As stated on the record, the court cannot find it to be improper for a juror to form an opinion during a witness's testimony that the witness is not telling the truth. There is no evidence that juror no. 72 prematurely discussed his views with other jurors, and the jurors were repeatedly instructed not to discuss the case among themselves until jury deliberations began. The record also established that juror no. 72's comment to the court officer was not made in the presence of other jurors.

RMS argues that there is evidence that juror no. 72 was influenced by extraneous information. The only basis for this contention is that the juror said that he had previously worked in a bank. Jurors are not required to leave their common sense or their life experiences behind them when they begin hearing the evidence.[8] The fact that a juror had previous experience in a bank does not remotely qualify as the kind of extraneous information that would require the court to set aside a verdict.

---

[7] The court does not specifically recall whether, after outright disqualification was denied, plaintiff's counsel then requested voir dire of juror no. 72. For purposes of this order, the court accepts counsel's representation that such a request was made.

[8] At the time of jury selection, neither party requested that jurors be asked whether they had any banking experience.

Nor was the court required to single out juror no. 72 for the voir dire proposed by RMS – "to determine the basis of his opinion." The court is simply not entitled to ask a juror to explain any views, preliminary or otherwise, that the juror may have formed about a case. Making such an inquiry would have placed the juror on the spot and would have run the risk of suggesting that the court agreed or disagreed with the juror's preliminary evaluation of the evidence. If there had been evidence that the juror had been exposed to extraneous information (as opposed to drawing on life experience), voir dire inquiry about the extraneous information would have been appropriate. That was not the situation in this case.

The entry shall be:

Plaintiff's motions for judgment as a matter of law and for a new trial are denied. The Clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: December _11_, 2009

Thomas D. Warren
Justice, Superior Court

10

--------------------------------------------------------------------

01 0000003741          BREWSTER, SETH
    ONE PORTLAND SQUARE PO BOX 586 PORTLAND ME 04112-0586
    F       RESIDENTIAL MORTGAGE SERVICES INC       PL        RTND    06/22/2007

02 0000007244          UHL, ERIC J
    D/B/A MOSS SHAPIRO 400 CONGRESS ST PORTLAND ME 04112
    F       GREGORY DAUPHINEE                        DEF       RTND    07/16/2007